PATRICK McGUIRE, Respondent, v. THE BELL TELEPHONE COMPANY OF BUFFALO, Appellant.

1. APPEAL — UNANIMOUS AFFIRMANCE — EXCEPTIONS. In an action for negligence, exceptions to a charge and refusal to charge as to the duty defendant, a telephone company, owes a lineman to inspect a pole used but not owned by it, without any request for the direction of a verdict or for a nonsuit, entitle the defendant to have the question thereby raised passed upon by the Court of Appeals although it is one necessarily determined by a denial of the motion to dismiss the complaint and a judgment entered upon a verdict in favor of the plaintiff has been unanimously affirmed by the Appellate Division.

2. MASTER AND SERVANT — DUTY OF INSPECTION. That a defective pole used by a telephone company as part of its permanent plant was not owned by it, but was used by permission or license of another company, does not relieve it from its duty to a lineman to have had such pole inspected, when his duty did not require that he should inspect it himself, or from liability to him if injured while tightening wires thereon, in consequence of the failure to make such inspection.

3. ASSUMPTION OF RISK. The fact that the lineman knew that the pole did not belong to the telephone company does not relieve the latter from liability where he is not chargeable with notice that the pole was used

under an arrangement with the company owning it by which his employer did not have the right to inspect or repair it and the owner of the pole was under no obligation to do either, and he does not assume the risk of such a situation.

*McGuire* v. *Bell Telephone Co.*, 52 App. Div. 635, affirmed.

(Argued March 28, 1901; decided May 17, 1901.)

Aᴘᴘᴇᴀʟ from a judgment entered June 27, 1900, upon an order of the Appellate Division of the Supreme Court in the fourth judicial department, overruling defendant's exceptions, ordered to be heard in the first instance by the Appellate Division, denying a motion for a new trial and directing judgment for the plaintiff on the verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Helen Z. M. Rodgers* and *Adolph Rebadow* for appellant. The trial judge erred in charging that the employer is bound to establish a system of inspection, below the surface of the ground, of poles which its linemen are required to climb in the performance of their duties, and that this duty extends to the inspection of poles owned and controlled by another company upon which the employer is a mere licensee to string its wires without the existence of any contractual relation in respect to their use. (*Flood* v. *W. U. T. Co.*, 131 N. Y. 603; *Gibbons* v. *B. El. Il. Co.*, 36 App. Div. 140; *Greene* v. *W. U. Tel. Co.*, 72 Fed. Rep. 250; *McIsaac* v. *N. W. E. L. Co.*, 172 Mass. 89; *C. T. Co.* v. *Loomis*, 87 Tenn. 504; *E. G. E. Co.* v. *Kelly*, 57 N. J. L. 100; *Holmes* v. *U. T. & T. Co.*, 41 N. Y. S. R. 767; *Dixon* v. *W. U. Tel. Co.*, 68 Fed. Rep. 630.) The doctrine of employee's risk is clearly applicable in this case, and the plaintiff should have been nonsuited for this reason. (*Ogley* v. *Miles*, 139 N. Y. 458; *White* v. *W. L. Co.*, 131 N. Y. 631; *Kaare* v. *T. S. & I. Co.*, 139 N. Y. 369; *Crown* v. *Orr*, 140 N. Y. 450; *Keith* v. *N. H. & N. R. Co.*, 140 Mass. 175.)

*Henry Selden Bacon* for respondent. The exceptions to the charge and refusal to charge present only the single ques-

27

tion whether the defendant was negligent and are not maintainable. (*Gottlieb* v. *N. Y., L. E. & W. R. R. Co.*, 100 N. Y. 462; *Goodrich* v. *N. Y. C. & H. R. R. R. Co.*, 116 N. Y. 398; *Eaton* v. *N. Y. C. & H. R. R. R. Co.*, 163 N. Y. 391; *B. & P. R. R. Co.* v. *Mackey*, 157 U. S. 72; *T. & P. Ry. Co.* v. *Archibald*, 170 U. S. 665.)

Cullen, J. The action is servant against master to recover damages for personal injuries. The plaintiff at the time of his injury was a lineman in the employ of the defendant, and pursuant to the direction of his foreman had climbed a pole on which the defendant's wires were strung for the purpose of tightening those wires. While engaged in this work the pole broke and the plaintiff was precipitated to the ground, receiving severe injuries. It then appeared that the pole was decayed and rotten in the interior with a mere shell of sound wood on the outside. It is conceded that the defective condition of the pole caused the accident. The evidence shows that this condition of interior decay without external manifestation is common in telegraph or telephone poles, and that to discover it poles are tested at intervals of time by digging down at the base of the pole and driving into the pole a crow bar or screw driver. These tests are not made by men while engaged in stringing the wires, but by separate gangs sent out for the purpose of inspection. When any pole is found to be unsound it is replaced by a new one. The pole which broke had been found, months before the accident, to be decayed and unsafe; but the inspection which revealed this fact was not made by an inspector of the defendant, but by a foreman of another company. The pole in question belonged to the Rochester Gas & Electric Company, which had erected a line of poles and wires for the purpose of supplying electric light, and it was its foreman who found that the pole was decayed. The defendant strung its wires on the poles of the gas and electric company by the license or permission of that company. No inspection of the pole was shown to have been made by the defendant at any time.

The unanimous affirmance by the Appellate Division of the judgment entered on the verdict is conclusive upon us that the evidence of defendant's negligence was sufficient to support the verdict. (*Reed* v. *McCord*, 160 N. Y. 330.)   The only question in this case that survives such affirmance arises on the charge of the trial court and its refusal to charge the defendant's request.   The court charged that the defendant was not relieved from responsibility by the fact that it was not the owner of the defective pole, and that it was its duty to exercise reasonable care by way of inspection to see that the pole was safe.   The defendant excepted to the charge that the ownership of the pole by another company did not relieve it from responsibility, and asked the court to charge that it owed the plaintiff no duty to inspect the pole.   This request the court refused and the defendant excepted.   It will thus be seen that the question raised by these exceptions, whether the defendant owed the plaintiff any duty to inspect the pole, it being owned by another company, is one of the very questions necessarily determined by the denial of the motion to dismiss the complaint.   But as the question was raised without any request for the direction of a verdict or for a nonsuit, the appellant is entitled to have it passed upon by this court.   Upon the manner or shape in which the question of law is presented depends the right of review by us.   In the case of a unanimous affirmance we are precluded by the Constitution from looking into the record to see if there is any evidence to support the verdict.   But a party is entitled to have his case submitted to the jury with correct instructions as to the law and we are equally precluded from looking at the evidence to see whether the propositions requested to be charged would logically have been fatal to the disposition of the motion for a nonsuit or for direction of a verdict.

The master personally owes to his servants the duty of using ordinary care and diligence to provide for them a reasonably safe place to work and sound and suitable appliances and materials with which to work, and is bound to inspect and examine these things from time to time and to use ordinary

care to discover and repair defects in them. (Shearman &
Redfield on Negligence, § 194; *Kain* v. *Smith*, 80 N. Y.
458; *Cone* v. *Delaware, L. & W. R. R. Co.*, 81 N. Y. 206 ·
*Probst* v. *Delamater*, 100 N. Y. 266; *Doing* v. *N. Y.,
Ontario & Western Ry. Co.*, 151 N. Y. 579.) "Reasonable care
involves proper inspection, and negligence in respect of it, in
such cases as this, is the negligence of the master, and none
the less so when the inspection is committed to a servant."
(*Byrne* v. *Eastmans Co.*, 163 N. Y. 461. See *Durkin* v.
*Sharp*, 88 N. Y. 225; *Bailey* v. *R., W. & O. R. R. Co.*, 139
N. Y. 302; *Hankins* v. *N. Y., L. E. & W. R. R. Co.*, 142
N. Y. 416.) The application of this rule may depend on the
nature of the work and the manner of its conduct. If this
injury had occurred to the plaintiff while engaged in the erec-
tion of a telegraph line, from the act of other workmen in the
selection of an unsafe pole when the master had provided a
sufficient number of sound poles, it may be that such selection
would be the negligence of a fellow-servant and the master not
be liable. But in the present case the plaintiff was employed
to work on a line already erected constituting the permanent
plant of the defendant. It may also be that defects in the
upper part of the pole can only be discovered by the linemen
when they ascend them, and that such inspection as is neces-
sary must be left to them to make. We may concede for the
argument that the defendant might have so conducted its
business as to have devolved upon the linemen all duties of
inspection of whatever character. But the undisputed evi-
dence in this case is to the effect that it did not so conduct its
business, and that the common practice of telegraph or tele-
phone companies is to make special inspection of their poles.
In *McIsaac* v. *Northampton Electric L. Co.* (172 Mass. 89) it
was held that the defendant was not bound as against its line-
men to inspect its poles below the surface of the ground. It
is said in the opinion in that case: "All the evidence tends to
show that in the ordinary course of the business the linemen,
who are often expected to work alone without supervision, as
the plaintiff was working at the time of the accident, would

examine the poles for themselves so far as they considered it necessary to do so for their safety. They easily could make any necessary tests to ascertain the condition of the poles as to soundness without the aid of special inspectors, and from their knowledge of common affairs could judge whether the pole was safe to go upon." The uncontroverted evidence in this case is to the contrary, and establishes that linemen do not test the poles which they seek to ascend, but leave that duty to be performed by inspectors. The advantage to the company by this course is plain. If each lineman was to dig around and test every pole before he ascended it a large part of his time would be taken up by this work alone, and repeated tests would soon impair the stability of the pole itself. There are cases to be found in other states tending to support the claim that a lineman assumes as a risk of his employment the chance that the poles may be decayed and unsafe, and that he must discover their condition for himself. Neither these cases nor the one cited from Massachusetts are authorities where it is shown to be the practice for the companies to make special inspections. There is, therefore, nothing in the present case, unless it be the ownership of the pole by another company, to take it out of the general rule laid down by Judge Landon in *Byrne* v. *Eastmans Company* (*supra*) that "Reasonable care involves proper inspection, and negligence in respect of it is the negligence of the master."

I do not think that the fact that the defendant did not own the pole which fell relieved it from the duty of reasonable inspection to see that the pole was safe. The pole formed part of the permanent line of the defendant through the streets of the city of Rochester. On that pole the defendant strung its wires. The stringing of the wires necessarily subjected the pole to strain, which would be increased by the weight of the lineman whenever he ascended the pole. If the pole was unsound and inadequate to bear this strain it would naturally result in the pole breaking down. The defendant's own work, therefore, was an essential factor in and a proximate cause of the falling of the pole. Certainly if the pole had injured a

passer-by, it would be no answer for the defendant to say that it did not own the pole. It was bound, both as to third parties and as to its own workmen, to erect and maintain a reasonably safe structure, and it had no right to use for that purpose an unsafe appliance, whether its own or that of a third party. By using the pole as part of its line, it adopted it as its own. As it would have been liable had the pole when first used been decayed and insufficient for the purpose of carrying its wires and supporting its linemen, it was equally liable when the pole subsequently became unsafe from decay, which reasonable inspection would have discovered. The duty of the defendant was just as great to safely maintain as to safely construct, and that duty cannot be delegated so as to exempt the master from liability. But I do not see that the defendant has delegated this duty. It received from the Rochester Gas & Electric Company a bare license to string wires on the poles. The latter company received no compensation for the privilege; it made no agreement to maintain the pole securely, and made no representation as to its condition or sufficiency. It would seem, therefore, that it owed the defendant no duty as to the safety of the pole which the latter used at its own risk, and it is questionable whether the Rochester company was bound to exercise any affirmative vigilance in favor of the defendant's employees. (*Larmore* v. *Crown Point Iron Company,* 101 N. Y. 391.) Had the defendant contracted with the owner of the pole for its proper inspection and repair or replacement, a different question would be presented, and it might be argued that in securing such an agreement it had exercised reasonable care to provide its workmen with a safe place and safe appliances. But as the defendant did not contract with others to inspect and repair the pole, that duty rested upon it.

It is claimed by the learned counsel for the appellant that the rule held by the trial judge in this case would lead to most unreasonable results. It is said that under the doctrine of the charge a merchant would be liable for injuries suffered by his traveling salesmen on railroads which the employer had neglected to inspect, and that a master would be similarly liable

for defects in an elevator which his workmen might be compelled to use in going to a place where they were to do their work. These are false analogies, and the doctrine of the trial court leads to no such conclusions. When it is said that the master is bound to furnish his servants a reasonably safe place in which to work, it is plain that this rule applies only where, in the ordinary conduct of the business, the master furnishes the place. In many occupations the master does not furnish the place for work at all. Such is the case in the instances suggested by the learned counsel, and many others, as where a master mechanic sends his journeymen to make repairs in the buildings of others, or where a contractor having agreed to cut timber from land employs laborers for the purpose. Instances might be multiplied indefinitely. In all these cases the exemption of the master from liability (except for hidden danger of which he has knowledge and which it would be his duty to disclose to his servants) is based, not on the theory that he may rely upon the owners of the premises having done their duty, but on the ground that in no proper sense of the term does he furnish the place. It is not so here, however. The pole was part of the permanent plant of the telephone line which the conduct of the business made it the duty of the master to furnish. The pole was in the possession of the master so far as it was capable of being possessed by any one. It was in constant service in maintaining the defendant's wires, and apparently at all times subject to be ascended by its servants when the necessities of the defendant's business might require. If the license received by the defendant from the Gas & Electric Company did not permit it to properly inspect the pole to ascertain its safety (which I deny), then the fault lay with the defendant in using a pole, the contract as to which with its owner precluded defendant from seeing that it was safe.

It is said that the plaintiff knew that the pole did not belong to the defendant. This is true. But it does not appear that he had any knowledge of the terms of the agreement under which the defendant used the pole. He is not chargeable

with notice of the fact that under the agreement the defendant, as is claimed by its counsel, had no right to inspect the pole or repair it, and the owner was under no obligation to do either. He cannot be said to have assumed the risk of such a situation.

The case of *Dixon* v. *Western Union Telegraph Company* (68 Fed. Rep. 630) is plainly distinguishable from the one at bar, and was doubtless well decided. The pole on which the plaintiff met his injury through the defective character of the clamps or steps attached to it, not only was not the property of the defendant company, but was not in any way used by it as a part of its line or plant. The occasion to ascend the pole arose from the fact that the wires on the pole interfered with the defendant's wires, and, hence, it was necessary to shift the position of those wires. The use of the pole was, therefore, as stated by the learned court, casual, and the decision of the court that the defendant was not liable for the condition of the pole proceeded on this ground, a ground which has no application to the present case.

The judgment appealed from should be affirmed, with costs.

Landon, J. I concur with Judge Cullen. As in the case of railroad cars, the company which uses them owes the duty to its servants of proper inspection as to their safety, whether such cars are its own or come to it from another line and company, so it seems to me that this telepone company, which uses the poles of another company, owes to its servants the like duty. The case of *Flood* v. *Western Union Telegraph Co.* (131 N. Y. 603) has but little resemblance to this case. There the workman subjected the defective crossarm of the telegraph pole to an excessive strain without looking, as he had full opportunity to do, to see whether it could bear it. The opinion of the court convicts him of gross carelessness. Here the workman had no opportunity to make inspection or means to do it with. The pole was part of the master's business plant, and, however acquired, it was the master's so far

as the relations between master and servant were affected by it. An elevator or railway car or other property wholly controlled by others is no part of the master's plant when his use of it is simply that of a customer or occasional repairer, and thus unlike this.

Parker, Ch. J. (dissenting). Defendant's foreman in its behalf requested permission of one Martin, the foreman of the Rochester Gas and Electric Company, to use certain of its poles to support defendant's telephone wires. Permission was granted, and several of such poles were used in connection with defendant's poles, the object being to lessen the number of poles used in a given street, and the defendant reciprocated by allowing the Rochester Gas and Electric Company to make a similar use of such of its poles as was desired. The plaintiff, a lineman in defendant's employ, on the twenty-third day of August, 1898, went up one of the poles thus used by the defendant for the purpose of taking the slack out of the wires on that stretch. While he was at work the pole fell to the ground severely injuring him.

An examination disclosed that the pole fell because it had become rotten beneath the surface of the ground. Above the ground the pole not only appeared to be, but was in fact in good condition. Upon that subject the plaintiff testified : " The outward appearance was good. It was perfectly sound so far as I could see, from the top of it down to the ground. I looked at the pole, that was all. To all appearances it looked sound. * * * Before climbing a pole I just look at the pole for the purpose of seeing whether there was any rottenness from its external appearance. I didn't see any rottenness. I always did that in climbing the pole; I looked at the pole. * * * I had no idea or thought that any of these poles were rotten or in bad condition. I could not tell from the outward condition of the pole, *nor could any other man.*"

There is only one method — so the witnesses on this trial agree — by which rottenness such as caused this pole to fall

can be discovered, and that is to remove the earth from around the pole to a depth of something like a foot, and then take an iron bar and attempt to thrust it into the pole at about the bottom of the excavation. The plaintiff testified: "The only way you can discover whether a pole is in good or bad condition at its base would be to take a shovel and a bar and dig down under the surface, a foot or half a foot, and then see if the crowbar will go through the pole. * * * I have seen the foreman do it. I have seen him shovel the dirt around the pole and take his crowbar and tap the pole for the purpose of seeing whether it is rotten or not; that is the way it is done." A lineman for the Rochester Gas and Electric Company said: "I have tested poles for that company. In testing we use a bar, and dig around the pole probably six inches; dig down and drive the bar in, and if the bar sinks pretty well in we call the pole pretty rotten. We then report them on a slip and give them to the foreman and he has them changed." .

Without contradiction, then, it is established in this record that the only method of inspection by which it was possible to ascertain the condition of this pole was by making an excavation about it, and then attempting to thrust an iron bar into the pole at the lower part of the excavation, acts which this defendant had no right to perform under its bare permission to use the pole for the purpose of stringing its wires, but acts which the Rochester Gas and Electric Company had both the right and the duty to perform, because it constituted the only method of inspection by which it could be kept advised of the condition of its poles. It owed a duty to the public, which gave it permission to use the streets for the erection of poles, to see to it that they should not become rotten, thus threatening danger to passers-by on the public streets.

The court said in the course of its charge to the jury: "He (the plaintiff) had a right to assume that the defendant had performed its duty in exercising reasonable care in furnishing him a safe place to work, and if the defendant omitted that duty, and by reason of that omission this accident occurred,

then the defendant is liable.   *   *   *   Now, gentlemen, I charge you that the mere fact that these poles were owned by another company did not relieve the defendant from the responsibility of inspecting them to see whether they were in a safe condition for the plaintiff to perform his work just as much as if defendant owned them." At the close of the charge the counsel for the defendant requested the court to instruct the jury " that the defendant owed the plaintiff no duty to inspect the pole that fell," which request was denied and an exception noted.   Whereupon the counsel took excep-tions covering the portions of the charge quoted.

In view of the undisputed evidence in the record, which is given by the plaintiff and the witnesses for the defendant, this request was the exact equivalent of a request to charge that defendant did not owe to plaintiff the duty of exca-vating around the pole of the Rochester Gas and Electric Company and then testing the pole at the bottom of the exca-vation by an iron bar before allowing the plaintiff to ascend it.   In no other way could an inspection be made according to the evidence, and it cannot be that one who must use the appli-ances of others that are in constant use and presumably inspected by them, must also make inspection or be mulcted in damages should injury result to some one in his employ. Such a claim assumes that a master has no right to trust any person or any agency ; that although he must take his employee on a train with him to a point where he is erecting a build-ing, still he must not trust to the inspection of the railroad company, although he knows it is their duty to inspect, but must himself inspect before he directs his employees to board the train ; that before he requires his workmen to enter an elevator to pass up to the ninth story of a building where he and they are engaged in decorating, he must make an inspec-tion of the elevator ; otherwise, in the event of an accident, a jury may be permitted to say that he failed in the perform-ance of his duty to the servant, as was done in this case.   The average human being would pronounce any such rule absurd, and would say that it is the duty of the *owner* of the elevator

to see to it that it is inspected; it is not everybody's duty, nor the duty of any one besides the owner. The progress of the world is founded upon trust and confidence, and the employer assumes and must assume that he who is charged with the performance of a duty will do it, and as it is the duty of the owner of an elevator to have frequent and careful inspections, the public assume that the duty will be performed, and, therefore, enter the elevator in full confidence whenever occasion requires. And the employer is not negligent who, without special warning, trusts himself and his workmen within the elevator. But all this is equally true of the electric light pole in this case. The Rochester Gas and Electric Company were charged with the duty of using reasonable and ordinary care to keep that pole in safe condition for the protection, at least, of passers-by upon the public streets, and this defendant, as well as all the rest of the public using that street, had the right to rely upon the company to perform that duty, and was not called upon first to doubt and second to trespass in a search for hidden defects where all appearances indicated soundness instead of rottenness.

But it is said if we grant that the master be not liable in the case of the elevator, because no authority can be found for it (which is equally true of this situation), a distinction can be drawn between such a case and the one at bar; for in the one the master is taking his men to work, and in the other he has actually put them to work, and it is settled law that a master must use reasonable and ordinary care to provide a safe place for his men to prosecute their work in. (*Flood* v. *W. U. Tel. Co.*, 131 N. Y. 603.) The suggestion is not that the one act is more reckless of the rights of employees than the other, but that a rule may be invoked and then applied which will make that which is a reasonably prudent act in fact an imprudent and negligent one in law. No such inconsistency can possibly result in the new situations which from time to time arise, if the courts but apply the rule according to both its letter and spirit — which do not require the master to insure his employees a safe place in which to work, but only

that he shall use reasonable and ordinary care to accomplish that result. This court has so applied it from time to time in many cases, from among which the following are cited as illustrations: *Cullen* v. *Norton* (126 N. Y. 1); *Perry* v. *Rogers* (157 N. Y. 251); *Capasso* v. *Woolfolk* (163 N. Y. 472); *Di Vito* v. *Crage* (165 N. Y. 378).

Recently this court reversed a judgment obtained against the owner of a building which fell during construction owing to defective execution by the contractor (*Burke* v. *Ireland*, 166 N. Y. 305); but if the respondent's contention be sound, the person engaged by the owner to do the plumbing would, under the rule requiring the master to use reasonable and ordinary care to provide a safe place for his workmen, be charged with the duty of inspection to see whether the contractor had properly constructed the foundation and, hence, chargeable in damages for injuries sustained by his men because of the fall of the building. No one has as yet presented such a claim to the court; but if this charge is to stand as a correct exposition of the law, such claims will be presented in the future, for in the vast and varied works of construction, in which many independent contractors are engaged, each will naturally, and in fact must necessarily, rely upon the caution and care of others to guard against destruction of property and of life.

The learned counsel for the plaintiff has not been able to bring to the attention of the court a single case supporting the charge of the trial court. Indeed, the only cases to which he invites attention are the cases requiring inspection by railroad corporations of foreign cars received upon their roads as well as of their own cars. (*Gottlieb* v. *N. Y., L. E. & W. R. R. Co.*, 100 N. Y. 462; *Goodrich* v. *N. Y. C. & H. R. R. R. Co.*, 116 N. Y. 398; *Eaton* v. *N. Y. C. & H. R. R. R. Co.*, 163 N. Y. 391; *B. & P. R. R. Co.* v. *Mackey*, 157 U. S. 72; *T. & P. Ry. Co.* v. *Archibald*, 170 U. S. 665.) It is the law in this state that railroad corporations owe to their employees the duty of proper and frequent inspection of cars and their appliances for the purpose of discovering defects

which may arise from use. (*Bailey* v. *R., W. & O. R. R. Co.*, 139 N. Y. 302.) Proper inspection of the equipment and machinery of a train is itself part of the duty of the company. (*Hankins* v. *N. Y., L. E. & W. R. R. Co.*, 142 N. Y. 416.) The rule is that if the appliances are not safe or proper on any of the cars, they must not be put in the train and started out, and the cases cited simply hold that it makes no difference whether the cars belong to the company or some foreign corporation, they must first be inspected, and if found unsafe they must not be put in the train. That this is so will sufficiently appear from a brief extract taken from the opinion of Judge Earl in the *Gottlieb* case, which is first cited by respondent's counsel : " It (the railroad company) owes the duty of inspection as master, and is at least responsible for the consequences of such defects as would be disclosed or discovered by ordinary inspection. When cars come to it which have defects visible or discoverable by ordinary inspection, it must either remedy such defects or refuse to take such cars ; so much, at least, is due from it to its employees. The employees can no more be said to assume the risks of such defects in foreign cars than in cars belonging to the company. As to such defects the duty of the company is the same as to all cars drawn over its road." A mere statement of the rule and the reason for it is sufficient without argument to show that those cases are not applicable in principle to the case in hand. There is no suggestion in those cases that the railroad company is responsible for the hidden defects in the foreign cars or their appliances when it undertakes to haul them over its road, but instead that it is responsible for those open and visible defects only which the ordinary train inspection will disclose, and so the rule simply commands that a company before it sends out a train shall have made an examination of the appliances of all cars for the purpose of disclosing open and visible defects readily discoverable by the ordinary system of inspection carried on by train hands, and requires that such inspection shall further be made as the train progresses on its route at

such times and places as experience teaches to be necessary and the convenience of the service will permit.

The only cases brought to our attention that are closely enough related in their facts to this one to justify their consideration as authority are *Dixon* v. *W. U. Tel. Co.* (68 Fed. Rep. 630); *McIsaac* v. *Northampton El. L. Co.* (172 Mass. 89), and *Flood* v. *W. U. T. Co.* (131 N. Y. 603). In *Dixon's* case the plaintiff, who was in the employ of a telegraph company, was engaged with others in stringing wires on its poles, and was instructed to climb a pole of another company to get certain wires out of the way. The plaintiff climbed the pole by means of iron spikes driven into it, did his work and while descending fell, in consequence of one of the spikes being insufficiently secured or having become loosened by the rotting of the wood. It was held on demurrer to the complaint that the plaintiff could not recover, and in the course of the opinion the court said : "The employer is not an insurer of the safety and sufficiency of the tools, machinery or appliances furnished to the employee for his use, nor is he a guarantor of the safety of the place where or upon or about which the employee is required to work. The duty cast by law upon the employer is to use ordinary and reasonable care to furnish safe and sufficient tools, machinery and working places. If he has done this, he has performed the full measure of his duty. * * * The pole in question, however, did not belong to the defendant. The use of it was casual and incidental to the nature of the service in which the plaintiff was employed. In a large city, where telephone, telegraph, electric light and electric railway poles and wires are numerous, in the erection of new poles and wires it is often necessary to climb poles already erected in order to raise or remove wires which would interfere with the erection of additional poles and wires. It was a part of the plaintiff's duty to climb such poles and to raise and remove obstructing wires. * * * He learned, or he might have learned, when he went up the pole, whether the spikes were securely fastened in the wood. He saw and used them in going up,

and a careful inspection, to insure his personal safety, was the first thing which ought to have been suggested to him. He knew that the pole which he was about to climb did not belong to the defendant (and so the plaintiff in the case at bar knew that the pole he was about to climb did not belong to his employer), and that it could not know the condition of the spikes, further than its foreman could ascertain it by an inspection of them standing on the ground."

In *McIsaac's* case the plaintiff was employed by the defendant as a lineman and was injured by the breaking and falling of a pole on which the defendant's wires were suspended. The pole was about 35 feet high, and the evidence tended to show that it was badly decayed a few inches below the surface of the ground, so that it broke off square with the strain upon it resulting from the plaintiff's weight and the force from the wires drawing upon it after other wires had been removed. Plaintiff was directed to go and take down from the pole two wires upon it which belonged to the defendant and put them on a new pole near by which had been erected there on account of a change of grade in the railroad at the crossing. The pole was of chestnut wood, about eight inches in diameter at the top and about fourteen inches at the surface of the ground. It had been set eight or nine years, and the evidence tended to prove that it showed no weakness or sign of decay about the ground. The opinion also indicates that the pole, while used by the defendant, belonged to another party. The entire court concurred in holding that the defendant did not owe to a lineman, whose business it was to work upon poles all along the line, as occasion might require, the duty of inspecting its poles below the ground and informing the lineman whenever any of them were so decayed as to be unsafe to work upon. Knowlton, J., in the course of his opinion, said : " The evidence was undisputed that it was easy to determine very quickly whether a pole was badly decayed a little below the surface of the ground, and that no skill or experience was required to do it beyond that which was possessed by ordinary linemen. The plaintiff testified that there were risks about

the business with which he was familiar as a lineman. We think that one of the most common and obvious of these, in reference to which both he and his employer must have been presumed to have contracted when he entered the defendant's service, was the risk that some pole of uncertain age might break and fall when a lineman was working upon it, if he did not take measures to ascertain its condition before going upon it."

The court having reached the conclusion that the defendant was not liable even though it had owned the poles, said at the close of its opinion that it was unnecessary, therefore, to consider "whether the general duty of the defendant to the plaintiff in regard to the strength of poles on which he was working is affected by the fact that it was not the owner of the pole that broke, but was merely using it in its business under the authority of the owner."

In *Flood* v. *Western Union Tel. Co.* (131 N. Y. 603) it is true that the pole was not the property of a third party, but belonged to the defendant, but even in that case a judgment in favor of plaintiff was reversed in this court where it was held that the plaintiff was not entitled to recover for fatal injuries sustained by the breaking of a crossarm on a telegraph pole precipitating him to the ground. Plaintiff's intestate was a lineman for the Western Union Telegraph Company and as such had frequent occasion to climb the poles and work about the arms. The arm in question when purchased was of the material, size and apparent strength of those in general use by telegraph companies. It was not discovered by the system of inspection which the defendant employed that there was anything about it indicating any defect or weakness. Six years of user and exposure to the elements, however, had so far weakened the arm that it failed to withstand the weight of plaintiff's intestate upon it, and it did not appear that during all that period of time the defendant had specially inspected that or any other arm for the purpose of ascertaining its strength. The defendant had inspectors who went along the line of telegraph poles and wires and carefully

29

looked at them and tried the poles to see if they were still strong and adequate, and such inspectors were also provided with arms with which to replace defective ones, but the inspectors were not required to climb up every pole and examine the arms, and it did not appear that this pole had ever been climbed by any inspector for any such purpose. An important difference between that case and this, which makes more strongly for the defendant, is the fact that in this case the defendant was not the owner of the pole, but occupied it in part under a license from the owner who at the same time made use of it and retained the general control over it.

In cities many telephone companies string their wires upon the roofs of buildings under a similar license, but it would hardly be suggested by any one that thereby it becomes the duty of the company to inspect the stairs or attic ladder ascending to the roof in order to ascertain whether it would support the weight of the lineman.

Our conclusion is that a person who uses a pole, building, steamboat or other property of another as a mere licensee — such property remaining in the control and possession of the owner — is not bound to establish a system of inspection and repairs in regard to such property in order to protect his employees from injury because of a hidden defect only discoverable by a system of inspection involving the necessity of dominion over the property. It follows that the exceptions were well taken.

The judgment should be reversed and a new trial granted, with costs to abide the event.

O'Brien, Landon and Werner, JJ., concur with Cullen, J.; Gray and Haight, JJ., concur with Parker, Ch. J.

Judgment affirmed.