LESTER B. ROSE v. MISSOURI DISTRICT TELEGRAPH COMPANY, APPELLANT.—43 S. W. (2d) 562.

LESTER B. ROSE v. SOUTHWESTERN BELL TELEPHONE COMPANY, APPELLANT.

LESTER B. ROSE v. UNION ELECTRIC LIGHT & POWER COMPANY, APPELLANT.

Court en Banc, November 17, 1931.

1010

1012

*Jones, Hocker, Sullivan & Angert* and *Ralph T. Finley* for appellant Missouri District Telegraph Company; *Francis R. Stark* of counsel.

1014

*J. A. Waechter, W. F. Coyle, E. J. Bean* and *J. W. Jamison* for appellant Southwestern Bell Telephone Company.

*Rassieur & Goodwin* for appellant Union Electric Light & Power Company.

*Charles P. Noell, Charles L. Moore* and *Allen, Moser & Marsalek* for respondents.

1016

FRANK, J.—Action by plaintiff, respondent here, against Missouri District Telegraph Company, Southwestern Bell Telephone Company and Union Electric Light & Power Company to recover damages for alleged personal injuries. Plaintiff recovered judgment in the sum of $50,000, and each defendant appealed. The three appeals were jointly submitted and will be disposed of in one opinion.

For brevity we will refer to defendants as telegraph company, telephone company and light company. Each of the companies was engaged in the business its name indicates in the city of St. Louis. The telephone company owned a certain pole, and for a consideration to it paid, leased space thereon to the telegraph company and to the light company, upon which such companies maintained their wires and cross-arms. A day or two before plaintiff was injured the telephone company removed its own cross-arms and wires from the pole. Plaintiff was in the employ of the telegraph company in the capacity of what is known as "trouble shooter." On April 15, 1926, he climbed this pole for the purpose of locating some trouble with the telegraph company's wires, which were located at the top of the pole. While climbing the pole, plaintiff took hold of a cross-arm which came loose from the pole, causing him to fall to the pavement, forty-two feet below. Plaintiff's evidence tended to show that this cross-arm belonged to the light company. Other facts pertinent to the questions discussed will be stated in course of the opinion.

Contention is made that the "petition charged the telegraph company and the light company with specific acts of negligence which nullified the general averments of negligence against the telephone company."

We do not so read the petition. The negligence charged against the telephone company is as follows:

"Plaintiff further states that the cross-arm attached to the pole aforesaid at a point about forty-two feet above the surface of the street was dangerous and unsafe to plaintiff and other persons rightfully required to climb said pole, in this, that said cross-arm was at the time and had been for a long time prior thereto as the defendants Southwestern Bell Telephone Company and Union Electric Light & Power Company knew or could have known by the exercise of ordinary care, out of use, old, weak, defective, rotten and not

securely attached to the pole, yet that said defendants in violation of their duty to plaintiff and to other persons rightfully climbing said pole negligently suffered and permitted said cross-arm long out of use to remain upon said pole for a long time prior to the date aforesaid, in the dangerous and unsafe condition aforesaid when said defendants knew, or by the exercise of ordinary care could have known, that said cross-arm constituted a nuisance and was dangerous and unsafe to persons climbing and working on said pole, particularly plaintiff, and that as the direct result of such negligence plaintiff sustained his injuries.''

It appears that plaintiff knew what caused his injury and he specifically alleged that it was caused by a defective and unsafe cross-arm the condition of which the telephone company knew or by the exercise of ordinary care could have known, yet, it suffered and permitted such cross-arm to be and remain on the pole for a long time prior to the date of plaintiff's injury. Where, as here, a plaintiff knows and alleges the negligent acts which caused his injury, such charge is specific and not general. [5 R. C. L. 84; Pointer v. Mountain Railway Construction Co., 269 Mo. 104, 189 S. W. 808, L. R. A. 1917B 1091.]

It is next contended that no case was made against the telephone company because plaintiff neither alleged nor proved that the leases between the telephone company and the lessee companies required the telephone company to exercise a supervisory control over the manner and condition in which the lessee companies maintained their wires and cross-arms on the pole. In other words, the contention is that it cannot be held that it was the duty of the telephone company to see that the cross-arms of the lessee companies were maintained in a reasonably safe condition because it was not shown that the leases between the telephone company and the lessee companies so provided.

We do not agree with this contention. It was the telephone company's duty to see that all equipment on the pole was kept in a reasonably safe condition regardless of whether the leases so provided. We say this because when the telephone company leased to the telegraph company space at the top of the pole, on which to maintain its brackets and wires, the telephone company was bound to know that it would be necessary for the employees of the telegraph company to climb the pole in order to reach and repair their employers' wires, and that in doing so they would necessarily pass the cross-arms of the light company on their way up the pole. By leasing space on the pole to the telegraph company, knowing that the employees of that company would climb the pole, the telephone company impliedly agreed to maintain the pole in a reasonably safe condition for climbing. The lease granting space on the pole to

1020

the telegraph company for its wires, would be of no value to that company if not founded on the implied duty of the telephone company to furnish a reasonably safe way of reaching such wires when necessary. This case is analagous to that of a landlord leasing to a tenant an apartment to which access is had by a stairway to be used in common with other tenants in the same building. By leasing the apartment under such conditions, the landlord would, as to such tenant, retain possession and control of the stairway, and it would be his duty to keep it in a reasonably safe condition for the use of such tenant. Speaking to such a question in Roman v. King, 289 Mo. 641, 233 S. W. 161, 164, we said:

"Whenever the owner of a house demises a portion of it to which access is had by way of halls, stairways, or other approaches to be used in common with the owner or tenants of other portions of the same premises, the owner, *by such transaction*, retains as to the tenant the possession and control of the undemised facilities, and it is his duty to keep them, or use reasonable care to keep them, in safe condition for the use of the tenant in the enjoyment of his own possession. Without the application of this rule in his favor the tenancy is a farce, and the tenant from month to month, as in this case, may be evicted without notice by the simple refusal of his landlord to maintain the only means of access." (Italics ours.)

The same thing may be said in this case. When the telephone company leased space on the pole to the light company and to the telegraph company for their cross-arms and wires, it necessarily knew that the employees of both companies would climb the pole in the performance of their duties in looking after the wires. It, therefore, impliedly agreed to maintain the pole in a reasonably safe condition for climbing because that was the only means of access to the wires. The telephone company concedes that it owed the employees of the telegraph company the duty to furnish and maintain a sound pole. The purpose of furnishing a sound pole for the employees of the lessee companies was to reasonably insure their safety while climbing it. It would be illogical to hold that the telephone company performed its full duty when it furnished a sound pole which was safe for climbing, if at the same time it maintained something on the pole which made it unsafe for that purpose. If the telephone company itself could not lawfully maintain a defective and unsafe cross-arm on the pole which would render it unsafe for climbing, it must follow that it could not, with impunity, knowingly or negligently permit another to do so.

While the petition did not allege that the telephone company retained control of the manner and condition in which the lessee companies maintained their equipment on the pole, or that it was

the duty of the telephone company to see that the lessee companies maintained their equipment on the pole in a reasonably safe condition, it did allege a state of facts from which that duty follows as a legal consequence. Where the facts alleged showed the duty of the telephone company, such duty need not be expressly alleged. [Coulter v. City of Independence. 154 S. W. 860, 168 Mo. App. 710.] It is sufficient if the pleader states the facts and leaves the court to find the law. [Otto v. Young, 227 Mo. 193, 127 S. W. 9.]

It is contended (a) that plaintiff assumed the risk of injury, and (b) that he was guilty of contributory negligence as a matter of law.

The rule to be applied in determining whether or not plaintiff assumed the risk of injury was approvingly quoted by this court from Joyce on Electric Law, Vol. 2, sec. 657, in the case of Shelton v. Kirksville Light, Power & Ice Company, 258 Mo. 534, 537, 167 S. W. 544. That rule reads as follows:

"The degree of care required of the company and the extent of risk assumed by the lineman are to be measured and determined in each case by the terms of the employment, the rules of the company as to the duties of the lineman, or the custom of the company as to inspection of poles, or other special circumstances affecting the duties and obligations of one or both parties."

The telegraph company's wires were located on a bracket at the top of the pole. The cross-arms on the pole were mortised into the pole and fastened thereto by a through bolt which passed through the cross-arm and through the pole. The cross-arms were supported by braces extending from the cross-arm to the pole. The places cut in the pole into which the cross-arms were mortised are called "gains." These gains were numbered from the top of the pole downward. There was a double cross-arm at the third gain which belonged to the light company. There were no cross-arms at the fourth and fifth gain. At the sixth gain there was a cross-arm that was not in use, that is, there were no wires thereon. Plaintiff's evidence tended to show that this cross-arm belonged to the light company. While climbing the pole for the purpose of locating some trouble with the wires of the telegraph company which were located at the top of the pole, plaintiff took hold of this cross-arm and it came loose from the pole and caused him to fall forty-two feet to the pavement.

Plaintiff testified that it was not his duty to inspect cross-arms or other equipment on the poles; that he was never ordered to make any such inspection; that when he was sent out to shoot trouble he was instructed to do his work as quickly as possible, did not have time to make inspections, and did not carry the necessary tools with

which to make an inspection of a cross-arm; that the proper tools for such an inspection were a chisel and a hammer with which to make the test, and a safety belt the use of which secured the workman's position on the pole and permitted him to use both hands in making the test; that he was told that he did not need a safety belt for his work; that the telegraph company had inspectors in its employ who made general inspections with a chisel, a hammer and a bar; that he had observed such tests being made by the telephone company and the light company; that the proper way to make a through bolt test was to take hold of the end of the cross-arm and shove it back and forth; that on the date of his injury he knew the manner in which inspections were made, knew these companies had inspectors out and knew inspections were made in the manner he had just described, although he did not know just when the pole in question had been inspected previous to his injury. Concerning whether or not the inspectors of one company would inspect the wires and cross-arms of other companies, plaintiff testified that they would make a general inspection "and see if their men can go up there safe." When asked if he did not know that the inspectors of one company did not inspect the property of another company, plaintiff answered: "Well, a general inspection, everybody has got to use the same pole." Plaintiff further testified:

"Q. You knew you were going over those cross-arms on poles, that you might want to inspect those—you knew that? A. Not that I would have to inspect that. You figure on the inspection being made already.

"Q. You didn't figure on the Missouri District Telegraph Company inspecting this cross-arm of the other companies, did you? You said that a while ago, didn't you? A. I know they did make inspections.

"Q. Well, you depend on the owner making inspections—is that what you mean? A. Inspections in general. That is what I mean.

"Q. State whether or not to your knowledge the Southwestern Bell Telephone Company and the Union Electric Light and Power Company employ general inspectors whose business it is to make inspections? A. Yes, sir, they do.

"Q. Did the Missouri District Telegraph Company have any inspectors at that time? A. Yes, sir.

"Q. Who are they? A. Jim Ulrich and Hugo Walker.

"Q. Now, what do those inspectors do? How do they inspect? A. Well, they go over the lead and see if it is safe.

"Q. When you say, 'Go over the lead,' does the lead include the wires and cross-arms? A. Yes, sir.

"Q. What do you mean by the lead? A. Generally that includes everything that is on the pole."

Under the evidence it cannot be said that plaintiff was employed to make a general inspection of the pole and cross-arms thereon. He was employed to locate defects which interfered with the operation of the telegraph company's lines. He was, therefore, justified in assuming that the pole and cross-arms thereon were in a reasonably safe condition, and he was not required to use more than ordinary care for his own safety while climbing the pole. Plaintiff had a right to assume before climbing the pole that defendants had inspected it because the duty of inspection was not placed upon him either by his contract of employment or by defendants' method or custom of conducting their business to his knowledge. [La Duke v. Hudson River Telephone Co., 120 N. Y. Supp. 171; Holden v. Gary Telephone Co., 122 N. W. 1018; Jennison v. Waltham Gas Light Company, 201 Mass. 352.] It is true that defendants' evidence on this issue squarely contradicted plaintiff's evidence, but such contradiction presented an issue of fact for the determination of the jury and its findings thereon is conclusive on this court. There was evidence tending to show that the defect in the cross-arm was not obvious. It is only the assumption of known or obvious risks by an injured servant which bars recovery. For the reasons stated, we hold that plaintiff did not assume the risk of injury.

Neither do we think the evidence showed plaintiff guilty of contributory negligence as a matter of law. He should not be convicted of contributory negligence as a matter of law unless the danger was so glaring and obvious as to threaten immediate injury. The through bolt which held the cross-arm to the pole was rusted. When plaintiff took hold of the cross-arm it came loose from the pole causing plaintiff to fall. Plaintiff testified that he knew the cross-arm in question was an abandoned cross-arm and that was the reason he looked it over; that he struck it twice with his screw driver and it sounded solid and he proceeded to go on up over it; that it looked solid enough to transfer his arms. He further testified:

"Q. Then you were aware from your experience that when you saw an abandoned cross-arm on a pole that it was more or less dangerous, weren't you? A. No; you look a cross-arm over and if it looks good you go on."

While on the witness stand, the cross-arm was shown to the plaintiff and he was asked if he could not see that it was old and cracked and rotten in places; his answer was, "No, it just looked weather-beaten." He said the bolts and washers on the front of the pole were rusted and stuck together, "but that through bolt was in there." He further testified:

"Q. I know the bolt is in there now, but there is a hole around there that is rotten, isn't there? A. Yes, but the washers had that covered up, and it sounded good."

1024

He also said, "You see lots of cross-arms in the city just like that in use today. I wasn't figuring on it to break. I figured on the inspection. That is what I was figuring on. I just hit it with a screw-driver to find out whether it was solid inside. You haven't got the time to make these inspections and you rely on the inspections being made."

Plaintiff's witness Hill, a lineman of many years' experience in the city of St. Louis, on cross-examination by counsel for the telephone company, testified: "Well, if you go out on trouble, you look for that trouble. You ain't inspecting. . . . You ain't going to put your weight on it if you think it ain't safe." On cross-examination by counsel for the light company, he further testified: "Why, in going up a pole that arm wouldn't look bad. . . . I have seen much worse arms than that. . . . I have put my weight on worse looking arms than this. The weak point in that you couldn't see. The weak point is over here you can see (indicating). The through bolt is hidden; you can't see it."

Both plaintiff and his witness Hill testified that where, as in this case, more than one company occupied the same pole with their wires and cross-arms, it was the custom and practice in the city of St. Louis for the employees of either company to climb the poles in the performance of their duties and to take hold of and use the cross-arms to aid them in climbing. Plaintiff testified that the quickest, safest and most convenient method of climbing a pole was to take hold of and use the cross-arms to assist in climbing.

Walter Elvidge, an employee of and a witness for the telegraph company, testified that it was customary for employees going up the face of a pole to use the cross-arms if they were good enough, and that fact was determined by the appearance of the cross-arm— by looking at it. In fact this witness went up the pole in question on the day of and shortly after plaintiff's injury, and in doing so he took hold of and stepped on one of the cross-arms as he went up the pole. This witness also testified that a trouble man was not expected to make cross-arm tests as he went up the pole; that "if the arm looks good, that's all."

Plaintiff was not guilty of contributory negligence as a matter of law in taking hold of the cross-arm as an aid in climbing the pole unless it conclusively appeared beyond reasonable inference to the contrary, that the danger in so doing was so obvious, imminent and threatening that a reasonably prudent person would not have done so. In determining this question, the evidence in plaintiff's favor must be accepted as true, that against him disregarded and the whole evidence viewed in a light most favorable to plaintiff, giving to him the benefit of every reasonable inference which a jury might legitimately draw therefrom, disregarding all inferences favorable to de-

fendants. Guided by this rule, we hold the question of plaintiff's contributory negligence was one of fact for the jury.

The telegraph company contends that in view of the nature of plaintiff's work, and the casual and momentary use of the pole, such pole was not a place of work within the meaning of the rule requiring the master to furnish the servant with a reasonably safe place to work. It is not plaintiff's duty to either inspect or repair poles or the cross-arms thereon. He was employed as a "trouble shooter." When the wires or circuits were out of order it was plaintiff's duty as "trouble shooter" to locate the trouble which he did by testing the wires. In the performance of that duty he had to climb the poles in order to reach the wires and remain on the pole while testing the wires. In other words, it was necessary for him to be on the pole in order to do his work. He could not do it in any other manner. It is obvious without discussion that the pole was his working place.

The telegraph company next contends that as it neither owned nor controlled the pole and cross-arm in question, it was not its duty to either inspect or repair same. A master who uses the property of another in his own business, is liable for injuries to his servants caused by the defective condition of such property. The telegraph company maintained its wires on the pole in question. It adopted the means of reaching its wires by requiring plaintiff to climb the pole on which there was a defective and unsafe cross-arm. Having adopted that way of reaching its wires, it owed plaintiff the duty to see that such way was reasonably safe. A case similar in principle was decided by the New York Court of Appeals in McGuire v. Bell Telephone Company, 167 N. Y. 208. There the telephone company had its wires strung on poles which belonged to the Rochester Gas & Electric Company. An employee of the telephone company climbed a pole for the purpose of tightening a telephone wire. The pole fell, and the employee was injured and sued the telephone company to recover damages for such injuries. The telephone company defended on the ground that it did not own the pole, and for that reason was under no duty to inspect it and see that it was reasonably safe. In denying the defendant's contention, the court said:

"I do not think that the fact that the defendant did not own the pole which fell relieved it from the duty of reasonable inspection to see that the pole was safe. . . . The pole was in the possession of the master so far as it was capable of being possessed by any one. It was in constant service in maintaining defendant's wires, and apparently at all times subject to be ascended by its servants when the necessities of defendant's business might require. If the license received by defendant from the Gas & Electric Company did

not permit it to properly inspect the pole to ascertain its safety (which I deny), then the fault lay with defendant in using a pole, the contract as to which with its owner precluded defendant from seeing that it was safe."

The ownership of the pole and cross-arms cuts no figure in this case. If the telegraph company's arrangement with the other companies did not permit it to inspect the pole and cross-arms and see that they were maintained in a reasonably safe condition, then it was guilty of negligence in requiring plaintiff to use instrumentalities which it had no authority to inspect and keep in a reasonably safe condition of repair, and over which it had no control. On the other hand, if it did have authority to inspect the pole and cross-arms and see that they were maintained in a reasonably safe condition, then it was guilty of negligence in failing to do so.

The light company contends that its demurrer to the evidence should have been sustained for the reason there was no evidence that it owned the cross-arm which fell with plaintiff. The cross-arm in question was located at the sixth gain on the pole. The evidence shows that the Kinloch Telephone Company, the predecessor of the defendant telephone company, leased space on the pole at the fifth and sixth gains to the Missouri Edison Electric Company. The City of St. Louis then granted the Missouri Edison Electric Company a permit to string its wires on the pole at the fifth and sixth gains. The defendant telephone company succeeded to all the rights and property of the Kinloch Telephone Company and at the time in question was the owner of the pole. The defendant light company succeeded to, and at the time in question was the owner of, all the rights and property of. the Missouri Edison Electric Company. Defendant light company contends that the application made to the city for permission to string wires on this pole did not ask a permit to place cross-arms thereon and the permit granted did not authorize the placing of any thing on the pole except wires. From this it is argued that it was the intention to string the wires upon a telephone cross-arm which was already on the pole. There is nothing in the application for the permit or in the permit itself indicating that there was a cross-arm on the pole at the sixth gain, at the time the application for the permit was made. A permit granting authority to string wires on the pole at the fifth and sixth gains necessarily implied authority to install cross-arms to support the wires.

Henry C. Berghoefer, permit and record clerk in the Department of Public Utilities in the city of St. Louis, testified as a witness for plaintiff. Concerning the permit which was granted authorizing the stringing of wires on this pole at the fifth and sixth gains, he said:

"Q. That gives them a right to string wires? A. Yes, sir.

"Q. Does that give them a right to erect cross-arms on those gains? A. When they are granted space they have to put a cross-arm on."

This permit was granted on July 30, and expired on August 10, if no work was done thereunder. Concerning the expiration of this permit witness Berghoefer testified:

"Q. It was issued on the 30th day of July, 1903, and if it was not exercised by the 10th day of August, 1903, it was revoked; isn't that right? A. That work was completed."

He further testified that it was the custom and practice to cancel such permits where no work was done thereunder, but there was no record showing that the permit in question was cancelled. Plaintiff testified that a light company cross-arm could be distinguished from that of a telephone company, because they were heavier built and had only eight pins, while a telephone company cross-arm had ten. He testified that the arm that fell with him had eight pins and that it was a light company cross-arm. Plaintiff's witness Hill and the telephone company's witness Thompson both testified that the cross-arm in question was the kind of an arm a light company uses.

Plaintiff's evidence as to the light company's ownership of the cross-arm, while squarely contradicted by defendant's evidence, was sufficiently substantial to make that question one of fact to be determined by the jury.

In this connection, it is contended that if it should be conceded the evidence was sufficient to raise a presumption that the light company owned the cross-arm, such presumption was overcome by the positive evidence of the light company to the contrary. One trouble with this contention is that it overlooks the distinction which should be made between a presumption and an inference. The words "presumption" and "inference" are sometimes treated as synonymous, but, properly speaking, a presumption is a mandatory deduction which the law expressly directs to be made, while an inference is a permissible deduction which the reason of the trier of fact makes without an express instruction of law to that effect. [1 Jones on Evidence, 59; 1 Greenleaf, Evidence, 107, 144.] As plaintiff's case as to the ownership of the cross-arm by the light company does not rest on a presumption, we are not called upon to determine whether or not a prima-facie case which rests on a presumption may be destroyed by evidence which contradicts the presumption. Our conclusion that there was substantial evidence tending to show that the light company owned the cross-arm, disposes of the further contention that such fact could not be found without piling inference upon inference.

It is next claimed that the court erred in refusing defendant light company's requested Instruction 1-G. The issue sought to be submitted by this instruction was fully covered by said defendant's given Instruction No. 3, hence no error was committed in refusing the instruction.

It is next contended the instructions given by the court, when considered together, authorized a verdict against defendants upon a mere finding for plaintiff on the issue of contributory negligence, without requiring any finding as to the negligence of defendants. The case was submitted to the jury under four instructions, one given at the request of plaintiff on the measure of damages, two given at the request of the telegraph company submitting the issue of plaintiff's contributory negligence and defining the term "ordinary care," and one given at the request of the light company submitting the issue of plaintiff's contributory negligence. The failure of the plaintiff to request and the failure of the court to give any instructions in behalf of plaintiff other than the one on the measure of damages was non-direction, not misdirection. Mere non-direction is not reversible error. In fact it is not contended that the giving of plaintiff's instruction on the measure of damages, standing alone, would constitute reversible error. The contention is that this instruction when considered with defendants' instructions on the issue of contributory negligence, narrowed the issues and authorized a verdict against defendants upon a mere finding for plaintiff on the issue of contributory negligence, without requiring any finding as to the negligence of defendants. If plaintiff had a right to have his case submitted under the measure-of-damages instruction alone, defendants could destroy that right by requesting an instruction on only one of the issues in the case, or convict the trial court of error for failing to instruct on all the issues in the case in the absence of a request so to do.

The telegraph company contends that the court erred in refusing its requested instructions A, B, C and E. Instruction A sought to withdraw from the consideration of the jury the allegation in the petition that the telegraph company negligently failed to provide plaintiff a reasonably safe place in which to work and to keep same reasonably safe by exercising ordinary care to examine and discover defects and dangers not open to ordinary inspection. B sought to withdraw the allegation that said defendant negligently required plaintiff to climb and work upon the pole when it knew or by the exercise of reasonable care could have known that the cross-arm thereon was dangerous and unsafe. The substance of Instruction C is that it was not the duty of the telegraph company to inspect or keep in repair the pole or cross-arm in question. Instruction E de-

clared that plaintiff had no right to assume that the telegraph company had inspected the cross-arm, and that he was not entitled to climb upon it without making such an inspection thereof as a reasonably prudent person would have made under the same circumstances, on the assumption that the telegraph company had inspected it. What we have heretofore said justifies the refusal of these instructions as well as the separate demurrers requested by each defendant.

The final contention is that the verdict is excessive. Respondent's condition as shown by the evidence is fairly summarized in his brief as follows:

"At the time of his injury plaintiff was a young man thirty-one years of age, in excellent health, with a life expectancy of 34.63 years, earning $5 per day. As a result of the casualty he has been rendered a helpless invalid, unable to work or to earn anything, and condemned to a life of suffering and misery. He has completely lost the sight of one eye, and the vision of the other eye is greatly impaired. His right leg was rendered useless and in order to get around at all he is forced to use a brace and crutches. He suffered various fractures of the skull, the fractures running down into the face, where there were compound fractures, with a depression in the forehead over the right eye extending downward and also toward the left, with a depression above the bridge of the nose and in the bones of the face. His nose was broken and there was a double fracture of the septum, which was pushed over to the left so as to exclude the left nostril entirely, in which position it was at the time of the trial, and he testified that he had to breathe through his mouth. The condition can possibly be remedied by an operation, but there is danger of brain infection, 'due to some involvement higher up.' Plaintiff's hearing is reduced to about one-fourth of the normal. His mouth is numb and his tongue swings toward the right side of the mouth, causing his food to get under his right jaw and clog on that side. His shoulder was injured, from which he still suffers pain and impairment of motion. He was unconscious for more than four weeks, has been in suffering and misery since, and will continue to suffer. And the medical testimony further shows that not only were there 'multiple fractures of the frontal region of the skull and face,' but an injury to the brain, and dullness and numbness of the entire left half of plaintiff's body, indicating an impairment to the nervous functions on that side, with a partial paralysis of that side, and that there is a 'lesion or disease or injury of the central nervous system in a certain portion coming from the brain down through the spinal cord.' And the testimony shows that plaintiff's nervous system is deranged so that he is in a highly nervous state, suffers from headaches and

dizziness, becoming dizzy whenever he lies down or stoops; that he is now slow in his movements and in talking, his memory is impaired and he is unable to sleep because of spells of jumping and nervousness, which he has practically every night.''

Plaintiff was in the condition above described at the time of the trial which occurred eighteen months after the injury. Dr. Barnes examined plaintiff in June, 1926, about two months after his injury. He examined him again in October, 1927, and found no improvement in his condition. He testified that plaintiff was unable to work or do manual labor of any kind. Defendants did not attempt to minimize plaintiff's injuries. They did not offer any evidence on that subject and did not cross-examine the doctors and X-ray experts who testified as to his mental and physical condition.

Notwithstanding the serious and permanent character of plaintiff's injuries, we think the verdict is excessive to the extent of $10,000.

The judgment is affirmed on condition that respondent within ten days enter here a *remittitur* in the sum of $10,000 as of the date of the original judgment; otherwise, the judgment is reversed and the cause remanded. *Atwood, C. J., Gantt, White* and *Ellison, JJ.,* concur; *Ragland, J.,* concurs in part and dissents in part in separate opinion in which *Henwood, J.,* concurs.

RAGLAND, J. (*Concurring in Part and Dissenting in Part*).—I am unable to bring myself to the view that the Telephone Company owed the plaintiff, an employee of the Telegraph Company, the duty of maintaining in a sound condition the cross-arm which belonged to the Light Company. The Telephone Company owned the pole on which it leased a designated space to the Light Company; on the space so leased to it the latter attached a cross-arm. This cross-arm was not only owned and maintained by the Light Company, but was thereafter within its sole possession and control. The Telephone Company had no control or supervision over it in any way either by contract or custom. As to this the evidence is all one way.

The theory of the majority opinion is that the alleged duty just referred to grew out of the relation which the owner of the pole, as lessor, bore to its several lessees, who occupied designated spaces on it for their cross-arms; that is, that the alleged duty is one implied by law. In support of such theory there is an attempt made to draw an analogy between the leasing of spaces on a pole, as in the case, and the leasing of apartments in a building where the landlord provides one common stairway for the use of all of his tenants as the sole means of ingress and egress to and from their several apartments. In the latter case the landlord not only owns

the stairway, but he retains the possession and control of it. From that fact and the further fact that the use of the stairway by all of his tenants is necessary to the enjoyment of the estates severally demised to them, the duty on the part of the landlord to maintain such stairway in a safe condition arises as an implication of law. In the instant case the lessor did not own the cross-arms, neither did it have possession of them. Nor were the cross-arms in whole, or in part, the means or instrumentality provided by the lessor for its tenants to go from the ground up to the spaces severally leased to them and down again. In other words it was not necessary for linemen to use the cross-arms in going up and coming down the pole. The cross-arms were placed on the pole for no such purpose. Such use as was made of them by linemen in ascending the pole was voluntarily made and for their own convenience. It further appears from uncontradicted evidence that the cross-arms did not constitute obstructions which had to be climbed over; all of them were attached to the same side of the pole; on the other side, termed by the witnesses the "back side," they offered no interference to one in climbing the pole or in getting down. The analogy invoked fails at every point. The liability of the Telephone Company asserted in the majority opinion seems to me unwarranted under any tenable legal theory.

I concur in the results reached in the opinion as to the liability of the two other appellants, and also as to the remittitur required as a condition for the affirmance of the judgment as against them. Henwood, J., concurs in these views.