JAMES NOLAN, RESPONDENT, v. JOPLIN TRANSFER AND STORAGE COMPANY, APPELLANT.—203 S. W. (2d) 740.

Springfield Court of Appeals. June 25, 1947

Motion for Rehearing or to Transfer denied July 16, 1947.

*Stanley P. Clay* and *Scott, Scott & Blair* for appellant.

*Nowman, Foulke & Warten* for Respondent.

FULBRIGHT, P. J.—We shall refer to appellant as defendant and respondent as plaintiff in the course of this opinion.

Plaintiff instituted this suit by filing a petition, April 23, 1945, in the Jasper County Circuit Court, asking for damages for personal injuries in the sum of $25,000. Defendant, in due time, filed his answer and plea to the jurisdiction. Subsequently, on a trial to a jury, a verdict was returned for plaintiff and against the defendant for $5,000. Being unsuccessful in its motion for a new trial defendant duly appealed to this court.

The petition alleges that the defendant requested or invited plaintiff to assist its agent in loading a truck with cases of cigarettes, which invitation was accepted by plaintiff; that defendant negligently and carelessly sent plaintiff up on top the load where the footing was unsafe and dangerous; that while thereon plaintiff was struck by a box negligently thrown by defendant's agent; that plaintiff lost his balance, his insecure and dangerous footing gave way thereby he was thrown about ten feet to the pavement below; that both arms, near the elbows were broken and permanently injured.

In its answer and plead to the jurisdiction defendant pleaded as a defense that plaintiff was a borrowed servant and (the time for filing a claim having elapsed) that the Workmen's Compensation Commission had exclusive jurisdiction, and, in the alternative, contributory negligence and special denials of charges of negligence contained in plaintiff's petition.

In his reply to defendant's answer plaintiff admitted certain allegations contained in the answer, among which were that the defendant had in its employ more than ten employees; that it was a major employer within the meaning of the Workmen's Compensation Act; that it had accepted the provisions of said Act and was operating thereunder at all times mentioned in the petition; that Section 3695,

Revised Statutes Missouri, 1939, is correctly quoted and that plaintiff's annual earning power does not exceed $3,600. But plaintiff denied that at any time mentioned in his petition or defendant's answer he was a borrowed servant or that he was under the jurisdiction of the Workmen's Compensation Act, either as an employee of the St. Louis San Francisco Railway Co.; or the Joplin Transfer and Storage Co. He further denied that he was at any time mentioned in the petition or answer guilty of contributory negligence and denies each and every other allegation and statement contained in the answer.

We have carefully reviewed the voluminous transcript of the testimony and, although violently conflicting, find that the facts in evidence show that on November 2, 1943, plaintiff was an employee of the Frisco Railway Company, working as a freight handler at its freight depot in Joplin, Missouri. A motor truck of defendant, engaged in city delivery of freight and in charge of defendant's agent, Joe Shiveley, called at the freight depot to pick up a load of tobacco for one of its customers. The truck was backed up to the Frisco loading platform, which was of about equal height as the floor of the truck, being about 3½ feet from the ground. The merchandise consisted mostly of cases of cigarettes and were carried on hand-trucks to the loading platform and on to defendant's freight truck. In the beginning Shiveley was unable to place the pasteboard cases as rapidly as they were being wheeled onto the truck; so plaintiff put his hand-truck aside and helped Shiveley place some of the packages of merchandise. When the truck was about full, from the front to the rear end to the bed and up to and level with the top of the stakes on said truck bed and of a heighth of about 5½ feet from the floor, Shiveley asked plaintiff to get on top of the load and place some additional cases of tobacco or cigarettes. Shiveley threw the boxes up on top of the load and plaintiff arranged them. During this operation Shiveley threw up a box while plaintiff was turned to pick up a box or arrange one. It struck plaintiff causing him to over-balance and at the same time his footing gave way and he fell to the ground, a distance of some nine or ten feet. As a result of this fall both arms were broken at the elbows causing permanent injury.

Defendant first contends that its demurrer to the evidence should have been sustained. In passing upon this question we must keep in mind the well settled rule that plaintiff's evidence must be accepted as true unless entirely beyond reason or contrary to physical facts; and that defendant's evidence, wherein it contradicts that of plaintiff, must be disregarded and that the plaintiff be given the benefit of every reasonable favorable inference from all the evidence.

It is undisputed that plaintiff was an employee of the Frisco Railway Company and had been for several months prior to November 2, 1943; that plaintiff helped the defendant load its truck with merchandise on said date and was injured while so assisting defendant. The

evidence further shows that after the truck was loaded to a height of approximately five and one-half feet from the bottom of the truck bed to the top and for the full length thereof, plaintiff, at the request of defendant, got up on top of the load for the purpose of placing cases of tobacco thereon. Plaintiff stated that Shiveley, the only agent and servant of defendant present at the time the truck was being loaded, asked him to get on top of the load. This is denied by Shiveley. We quote the following testimony of plaintiff relative to what was said when he was asked to get on top of the load:

"Q. Then what did you do then? A. I said, 'OK, but I will go see my boss.'

"Q. You said 'OK, but I will go see my boss?' That was your boss, Mr. Timberlake that was on the stand here? A. Yes, sir.

"Q. Did you see your boss? A. Yes, sir.

"Q. What did you say to him? A. I asked him if I could get up on the truck and he said OK.

"Q. You asked him if you could get on the truck and he said OK. A. Yes.

"Q. When, when you came back the load was still there like it was, this six feet high and about up to the stakes? A. It was up to the stakes, sir.

"Q. Did you climb up on the truck then? A. Yes. . . ."

The evidence discloses that plaintiff, on his return, told Shiveley that it was okay. Plaintiff then got on the top of the truck load of cigarette cases and Shiveley pitched additional cases up on top to be placed by plaintiff.

This is all the evidence in the record to support defendant's contention that plaintiff was a borrowed servant. It is true, Shiveley stated that there was an agreement or understanding between the railway company and the transfer company, the nature of which, if any, is not disclosed. Shiveley testified positively that neither plaintiff nor any other employee of the Frisco had ever been up on the top of a load of this kind before. J. T. Timberlake, the Frisco Warehouse Foreman, testified that he had no understanding or agreement with the defendant whereby he loaned his employees to it; that he had no understanding or agreement with defendant on November 2, 1943, whereby he loaned the plaintiff to the defendant; and Shiveley, on cross examination, testified to the same effect. Timberlake further testified that he, as warehouse foreman, had exclusive control and authority over plaintiff up until the time of his injury.

It is our conclusion that this evidence falls far short of proving that plaintiff was a borrowed servant at the time of his injury. The evidence is sufficient to show that plaintiff was not a mere volunteer or trespasser or a licensee and that he was lawfully on defendant's truck on business or for a purpose in which defendant was interested, thereby occupying the status of an invitee to whom defendant and its

servants owed the duty of exercising ordinary care to avoid causing plaintiff injury while thus engaged. [Daugherty v. Spuck Iron & Foundry Co., 175 S. W. (2d) 45, loc. cit. 49.]

"It is true that the doctrine of ordinary care applicable to an invitee usually arises in connection with injuriess sustained from defects, dangerous substances, or instrumentalities in or on the premises of the owner or occupant of the place where the injury occurred, and involves the element of superior knowledge of such conditions on the part of the owner or occupant and a lack of knowledge on the part of the injured party. However, we know of no rule that limits the requirement of such ordinary care so as to exclude from its protection one who is injured by the negligent acts of the owner's or occupant's servants, within the scope of their employment, while such injured party is an invitee on the premises of the master of such servants." [Daugherty v. Spuck Iron & Foundry Co., supra, loc. cit. 50.]

There is ample evidence to sustain the view that plaintiff received his injuries as the direct result of an act of one of defendant's servants who was, at the time, acting within the scope of his employment. It was a question for the jury to determine whether plaintiff sustained his injuries as the direct result of negligence of one of defendant's servants while such servant was acting within the scope of his employment; and, also, whether or not defendant's agent and servant, Shiveley, invited plaintiff to get on top the load of merchandise and place additional boxes thereon. However, since plaintiff's testimony was to the effect that Shiveley requested him to get on the load and place the boxes and Shiveley denied making such request and stated that plaintiff volunteered to go on top the load, such conflict must be resolved in favor of plaintiff on a demurrer to the evidence. [Daugherty case, supra.]

We find no substantial testimony in this record to support defendant's contention that it was a special employer or that plaintiff was a borrowed servant. Such contention finds no support even under defendant's own evidence. Under the law "the relation of employer and employee exists as between a special employer to whom an employee is loaned and said employee whenever the following facts concur: (a) Consent on the part of the employee to work for the special employee; (b) actual entry by the employee upon the work of and for the special master pursuant to an expressed or implied contract so to do; (c) power of special employer to control the details of the work to be perfromed and to determine how the work shall be done and when it shall stop or continue." [Ellegood v. Brashear Freight Lines, 162 S. W. (2d) 628, loc. cit. 633, and cases therein cited.]

When we apply this test to the case at bar we find the evidence wholly insufficient to establish either an expressed or implied contract between the Frisco Railway Company and defendant, or between

plaintiff and defendant. It is, therefore, our view that defendant failed to sustain its burden of proving that plaintiff was a borrowed servant or that defendant was a special employer, or that the injuries received by plaintiff were controlled by the Workmen's Compensation Act.

Defendant also complains that the court committed reversible error in permitting plaintiff's witness Timberlake to testify that there was no understanding or agreement with the defendant whereby the Frisco Railway Company loaned its employees to defendant; and to further state that plaintiff was under the direction and control of the Frisco Railway Company on the date of plaintiff's fall which caused his injuries and that the place where plaintiff was working at the time of injury was unsafe, proceeding upon the theory that such testimony was merely conclusions of the witness. It is our view that it was not mere opinions or conclusions of the witness but was testimony as to actual facts which were within the knowledge of the witness. The same is true as to a similar complaint lodged against the testimony of plaintiff. Similar testimony was permitted and considered by the court in determining a like question in the case of McFarland v. Dixie Machinery & Equipment Co., 153 S. W. (2d) 67, loc. cit. 68 and 69. See also Schmidt v. Pitluck, et al., 26 S. W. (2d) 859, 862; 22 C. J. 533, 563, 638 and 639.

It is further urged by defendant that plaintiff's "own testimony, both oral and by deposition, signed by him, utterly defeats his right to recovery;" and that plaintiff "may not question the truth of his own testimony, he being bound by his own evidence, neither corrected nor explained by him." We have very carefully read plaintiff's testimony time and again and find that most of the apparent conflicting statements therein were brought about by a lengthy, withering cross examination of the witness, a 19 or 20 year old boy, without education (not having completed the 8th grade) and who had never been on a witness stand or given a deposition before. The Claim Agent for the Frisco Railway Company, who had had twenty years experience as such, stated that plaintiff said that "one of the boxes rocked under his foot and he fell over the side of the truck on the ground." In a deposition given by plaintiff on the 21st day of May, 1945, he stated: "He (Shiveley) throwed up that box to me and it knocked me off my balance and I fell off and fractured both arms. . . .

"Q. The box gave way at the time your were hit? A. The box gave way at the time I was hit. . . .

"Q. Which foot was it that slipped? A. Both of them slipped at the same time, as I remember. . . .

"Q. Could you feel the box giving way under you? A. No; I couldn't till it was all over. This box tipped just like that (indicating) and it hit the side of the truck. . . .

928

"Q. You don't know whether the box thrown to you or the giving way of the box on the truck was what caused you to fall, you don't know which one? A. No, I couldn't tell. . . .

"Q. Now you told Pete Timberlake, your immediate boss, your foreman there, how this accident happened when he asked you how in the world it happened, didn't you? A. I am sorry, sir, I didn't tell Pete Timberlake how this accident happened because "if you look at the time I was unconscious and they laid me up there against— and they picked me up and put me into the place, and none of them, no one came around me until I went home at 8:30, 25 minutes till 9, when we came up by the Rogers Iron Works until I came to later.

"Q. You never came to until you left there? A. Completely, until I left there and up there by the Rogers Iron Works.''

At the trial plaintiff stated that a box was pitched up on the load by Shiveley which struck his right leg and at the same time he lost his balance, his footing gave way and he fell.

Many of the apparent conflicts in plaintiff's testimony are more indicative of confused answers as a result of a continual harrassing and badgering of the witness on cross examination rather than contradictions. "A contradictory statement is one that is the exact negative of another, as "white" and "not white" are contradictories." The statements of this witness were not of his nature. "It is seldom that a witness, in the course of an adroit cross-examination, does not make some statement, which, when taken alone and without consideration of the witness' other testimony, might appear to be conflicting. But when the testimony of the witness as a whole is indicative of one consistent state of facts the testimony of such witness should not be held so contradictory as to destroy it because by inadvertence or for any other reason a segregated answer to a question might be construed as differing from the witness' other testimony." [Murray v. St. Louis Public Service Co., 201 S. W. (2d) 775, loc. cit. 779.]

"We grant the rule that an admission as to a material fact, made in the course of the testimony of a party litigant himself, is binding on him; but it is only to be taken as presumptively, and not as conclusively, true, and, where the admission is in the nature of an estimate or guess, it may be overcome by other evidence of the facts and circumstances in regard to which the admission was made. (Citing cases)

"The exception of the rule announcing the binding force of an admission precisely covers the situation here. There is not a word in the record to indicate fraud or bad motives on plaintiff's part in changing certain details of her testimony; ". . . But at any rate there was nothing absolutely conclusive about her statements on cross-examination; and consequently, despite the contradictions in her testimony regarding the circumstances surrounding the accident, her

credibility as a witness, as well as the weight to be accorded her whole evidence, was for the jury to determine.'' [(Citing cases) Haddow v. St. Louis Public Service Co., 38 S. W. (2d) 284, l. c. 286, 287.]

What we have quoted from the above cases applies with equal force to the case at bar.

We shall next consider the assignment that plaintiff was guilty of contributory negligence as a matter of law. The burden of proving contributory negligence devolves upon defendant, Rentfrow v. Thompson, 348 Mo. 970, 156 S. W. (2d) 700, l. c. 704, and the proof must be of such clarity and cogency on the question of contributory negligence that reasonable minds may not differ concerning such negligence. Otherwise the question is one for the jury and not for the court. [Taylor v. Alton R. Co. (Mo. App.), 148 S. W. (2d) l. c. 808; Clader v. City of Neosho, 198 S. W. (2d) 523, l. c. 528.] And, ''in determining this question it must be borne in mind that the evidence in plaintiff's favor must be accepted as true, that against him disregarded and the whole evidence must be viewed in a light most favorable to plaintiff, giving him the benefit of every reasonable inference which a jury might legitimately draw therefrom and disregarding all inferences favorable to defendant. [Rose v. Telegraph Co., 328 Mo. 1009, 1024, 43 S. W. (2d) 562, 81 A. L. R. 400.'' Howard v. S. C. Sacks, Inc., 76 S. W. (2d) 460, l. c. 465.]

The undisputed evidence shows that the truck was loaded in even layers of cases of cigarettes of uniform size which came up to the top of the truck body and being between five and six feet above the floor of the truck. The evidence further shows that Shiveley, the servant of defendant and the only representative of defendant present at the time plaintiff was injured, stacked every case of cigarettes, or directed the place where each should be placed and that he loaded and stacked the case or cases from which plaintiff fell. He had been loading identical merchandise for ten years, almost every day, upon the truck or a similar one from which plaintiff fell, using the identical method of loading; that he had been on top of the load hundreds of times when the truck was loaded in the way and manner in which it was when plaintiff fell therefrom; that he knew in detail just how the truck was loaded and how it had been loaded with similar merchandise prior to that time.

By persistent and unrelenting cross examination defendant tried to lead plaintiff to say that there was a space of six inches between the boxes and the east side of the truck bed.

''Q. How did you lay them down? A. Just like it is there, Sir, flat, Sir.

''Q. Flat? A. Yes. Three more boxes across.

''Q. Three more across. What is the width of that box? A. That box right there is a foot and a half.

"Q. A foot and a half? A. Yes.

"Q. And four times a foot and a half is 6 feet? A. Yes.

"Q. And what was the width of that truck? A. The width of the truck is 6-½ feet, Sir.

"Q. So there was a half foot there that was air space? A. Yes, sir.

"Q. Was there? A. I don't know.

"Q. There wasn't anything there except air, was there? A. I guess not, Sir.

"Q. On which side was this space, the east or west side of the boxes? The east side, wasn't it? A. No, sir; the west side.

"Q. Wasn't that—you didn't fall on the west side, did you? A. I fell off the east side.

"Q. Isn't it true that the space between the boxes on the east side and the east side of the truck? A. What do you mean, Sir?

"Q. That is to say that there wasn't—the truck was wider than the boxes, the bed of the truck was wider than the 4 boxes? A. No, sir. Yes, sir, it was.

"Q. So that there was 6 inches there that there wasn't anything loaded in? A. That is right, Sir.

"Q. Do you remember which side of the truck it was, you tell this jury, if you can remember, which side it was that the space was between the boxes and the side of the truck? A. I believe it was the west side, Sir.

"Q. You believe it? A. Yes.

"Q. You are not sure about that? A. Not for sure."

Then after a prolonged cross examination on other points he was asked the following question:

"Q. And you are not certain whether the space of 6 inches was on the east or west side, it was one or the other? A. It was one or the other."

The above excerpt from the cross examination of plaintiff is typical of the whole cross examination and is indicative of a bewildered and confused witness. Many of the answers were placed in the mouth of the witness by a shrewd cross examiner. Yet, there was an utter failure to establish by the witness that which defendant sought to prove.

On this particular point Shiveley testified that the cases were so placed or arranged across the truck bed that less than an inch remained between the end of the cases and the sides of the truck bed. It is further shown that the case of merchandise which contributed to plaintiff's injuries was stacked by Shiveley, or placed in its position at Shiveley's direction before plaintiff was requested to get on top the load. This was the first and only time plaintiff had been on this or any other truck loaded as in this instance. He had no knowledge

of the danger to be encountered in so doing. Nothing from appearances warned him in any way.

In view of these facts and the evidence that has heretofore been set forth the court would not have been justified in sustaining the demurrer on this ground unless the danger was so glaringly apparent that an ordinarily prudent man, under the same or similar circumstances, would not have acted as plaintiff did on the occasion mentioned. Howard v. S. C. Sacks, Inc., *supra*. The question was one for the jury and not for the court. It is our conclusion that there was ample substantial testimony to warrant the court in submitting the case to the jury and that his refusal to sustain defendant's demurrer to the evidence did not constitute reversible error.

Defendant contends that the giving of plaintiff's instruction No, I was erroneous because the relationship of master and servant existed between plaintiff and defendant; because plaintiff was a loaned employee and because, in view of this situation, the court had no jurisdiction of the case, same being in the exclusive jurisdiction of the Workmen's Compensation Commission. In view of our conclusions heretofore reached on these issues defendant's objections are not well founded.

Plaintiff's Instruction No. 2 is based upon the theory that the defendant was an invitor and that the plaintiff was an invitee on the truck. There is ample evidence in the record to justify the giving of the instruction, notwithstanding defendant's contention to the contrary. It is our conclusion that no reversible error was committed by the court in the giving of plaintiff's Instructions numbered One and Two.

At the request of defendant the court gave and read to the jury instructions numbered 3, 7, 8, 9, 10, 12, 13, 14, 15, 16 and 18, being eleven in all and covering approximately ten typewritten pages. The instructions covered everything necessary, and more, including instructions governing affirmative defenses pleaded by defendant. The court refused instructions numbered 1, 2, 4, 5, 6, 11 and 17, submitted and requested by defendant. Since the instructions requested by defendant and given by the court fully and fairly covered each and every issue in the case it was not error for the court to reject the last above numbered instructions.

Finally, we shall dispose of defendant's complaint that the verdict and judgment was excessive. Dr. Chenoweth, whose qualifications were admitted, testified as an expert witness to the effect that at the time of the trial plaintiff's disability to his right arm was around 75%; that he had fairly good rotation but could only straighten his arm to about a 75 degree angle; that he has some strength in the arm but it is weak; that with operative correction and surgery he would get some improvement in the use of his right arm but could

932

not say how much. The doctor further stated that he did not find very much wrong with the left arm.

Dr. Mervin H. Black corroborated the tesitmony of Doctor Chenoweth in all material matters. He testified that the condition of plaintiff's right arm was permanent unless surgery would happen to be successful; that he didn't find plaintiff's left arm particularly weak but the right hand grip was definitely weakened.

Dr. James, witness for defendant, stated that plaintiff was injured at about 8:30 in the morning; that he examined him on November 2, 1943, at 10:10 A. M.; that plaintiff "had a fracture of the lower end of both humeri; of the humerus of the big bone in the arm." He further stated that when plaintiff came to him his arms about the elbows were severely contused or bruised; that both were swollen so badly that he didn't dare work them around; that he didn't have the X-rays made that day because there could be nothing done for him except rest and heat. It was also shown that plaintiff was unable to work for approximately one year.

"The presumption is in favor of right action on the part of the jury and the trial judge." Gerran v. Minor (Mo. App.), 192 S. W. (2d) 57. And an appellate court should not interfer unless the award is grossly excessive or is unreasonably beyond the bounds of reason or is shocking to the judicial conscience. Marshall v. St. Louis Union Trust Co. (Mo. App.), 196 S. W. (2d) 435, l. c. 437. Moreover, in determining whether or not a verdict is excessive the evidence most favorable to plaintiff should be considered, as well as the change in economic conditions and the reduced purchasing power of the dollar. Clader v. City of Neosho, supra, and cases cited. It is the policy of the courts to maintain as far as possible a reasonable uniformity of verdicts in cases wherein the injuries are similar. Goslin v. Kurn et al., 351 Mo. 395, 173 S. W. (2d) 79, l. c. 89, and cases there cited. See Greenan v. Emerson Electric Mfg. Co., 191 S. W. (2d) 646 l. c. 652 for a comparison of injuries and damages received.

Considering the nature of plaintiff's injuries, that they are permanent and the evident pain and suffering endured, it is our conclusion that a judgment for $5,000 is not excessive.

The judgment of the trial court should be affirmed. It is so ordered. Blair, J., and Vandeventer, J., concurs.