**KERN v. CHICAGO BRIDGE & IRON CO.**

**DAVIS v. CHICAGO BRIDGE & IRON CO.**
Nos. 2478, 2479.

United States District Court
W. D. Kentucky. Louisville.
Sept. 21, 1953.

Allen P. Dodd, Jr., Dodd & Dodd, Louisville, Ky., for plaintiffs.

R. Lee Blackwell, Louisville, Ky., Richard A. Barton, Chicago, Ill., Bullitt Dawson & Tarrant, Louisville, Ky., for defendant.

**86**

SHELBOURNE, Chief Judge.

The above cases were tried together to a Jury.

The injuries sustained by the plaintiffs were sustained in the same accident and the Jury returned a verdict in favor of the plaintiff Kern in the sum of $8,606.-75 and in favor of plaintiff Davis in the sum of $8,243.55. The cases were submitted to the Jury on Interrogatories.

Within ten days after the verdicts were returned, defendant moved to have the special verdicts and judgments thereon set aside and for judgments in accordance with defendant Chicago Bridge and Iron Company's motion for a directed verdict and alternatively asked for a new trial, all as provided by Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S. C.A.

The cases are now before the Court on the defendant's motions.

Briefly stated, the facts are that the Louisville Refining Company undertook a construction program at its Louisville plant and contracted with the Chicago Bridge and Iron Company to erect a Reactor Regenerator, a Stair Tower and a small Tank. The Refining Company contracted with the Petroleum Piping Company for the erection of a structure known as a Main Fractionating Column and pipe fittings in that structure and in all the other new structures at the Refining Company's plant.

The Chicago Bridge and Iron and Petroleum Piping Company dealt directly with the Louisville Refining Company and neither was a subcontractor for the other. Each had its own separate contract with definitely defined work to do.

Petroleum began work on its contract October 23, 1950 and completed its work February 26, 1952. Chicago Bridge started its work March 26, 1951 and finished July 9, 1951.

Chicago Bridge owned a derrick designed and used in hoisting men and materials to a great height. Petroleum owned a Crawler Crane, mobile in character.

In the work embraced in their respective contracts, each of the contractors was required to do work, some of which had to be done with a derrick such as that owned by Chicago Bridge and some of which had to be done by the smaller type or Crawler Crane owned by Petroleum.

Lester K. Beach was the Superintendent of Chicago Bridge work, and Thomas Anderson was Superintendent in charge of the Petroleum Company's operations.

Shortly after their Companies received their respective contracts, Beach and Anderson entered into an agreement by which Chicago Bridge would furnish to Petroleum the former's derrick and its Operating Engineer, an employee of Chicago Bridge, for the work necessary to be done by a derrick and in turn Petroleum Pipe would furnish Chicago Bridge the Crawler Crane and its Operating Engineer, the latter being an employee of the Petroleum Pipe Company.

Edward Uebelhoer was the operating engineer on Chicago Bridge's derrick crane and it became reasonably certain from the evidence heard in the case that the accident out of which the injuries to plaintiffs arose in this case was due to Uebelhoer's negligent operation of the derrick crane. His explanation was "dog was bound to have kicked out".

Beach's version of the contract for the use of the equipment made between him and Anderson was "When I first went on the job, we talked about using each other's equipment; and we had a verbal agreement between us that whenever he needed mine, which was the guyline derrick, he could use it without any expense involved in it. He would use the same operator that was on, operating that guyline derrick. * * * The operating engineer, he would be the operator. He is the hoisting engineer—we have two ways of saying it, operating engineer or hoisting engineer. So then in return, if I should wish to have his crawler cranes, I could use it but I would still use his operator that he had on that crane, be-

cause each one was familiar with the item or machine that they were on. That is the arrangement that we had between us. * * * Whenever my derrick was loaned to Petroleum Piping Company, they were in full control of it. When I, for Chicago Bridge, would use their crawler crane, I was in full control, or Chicago Bridge, they had nothing to do with it at all."

Anderson described the arrangement as follows: "It was agreed that, with the proper arrangements and the notice and everything, when they did not need their derrick and we had use for it, we could take that derrick, and use it. And the same with the derrick, we used their operator and the derrick and we would do whatever work we had for it—whatever craft for the particular work that we had to be done would work on the derrick. And in turn, whatever work he had to do, he used our crane and operator".

Uebelhoer, operator of the derrick crane, was an employee of Chicago Bridge and remained on their payroll at all times and Chicago Bridge paid for the fuel and all expenses incident to the operation of the derrick crane. In like manner, Petroleum Piping, when its crawler crane was being used, paid the operator who was an employee of the Petroleum Piping Company and paid the expenses and for the fuel incident to the operation of the crawler crane.

The cranes were operated pursuant to signals given to the operating engineer. When the Petroleum Piping used the Chicago Bridge's derrick, Petroleum Piping Company's signal man gave certain signals to the operator of the derrick which directed the engineer in the handling of the derrick.

On the day of the accident, June 11, 1951, the plaintiffs Kern and Davis were being lifted in the bucket of the derrick and when they were at an elevation of approximately 80 feet, the bucket was suddenly dropped and plaintiffs sustained the serious injuries about which they complain.

The sole question raised by defendant's Counsel is that under the "Lent Servant and Equipment Rule", as determined by the Kentucky Court of Appeals, there was no liability on the part of the Chicago Bridge & Iron Company, because it had merely loaned its derrick and operator to the Petroleum Piping Company and the latter company was in charge of the work and is responsible as Master of Uebelhoer and as the owner of the equipment.

 Counsel states the rule as follows, quoting from Bowen v. Gradison Construction Company, 236 Ky. 270, 32 S.W.2d 1014, 1016—

"A servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the party to whom he is loaned or hired, and this is true even though the servant is selected, paid, and may be discharged by the original employer. 39 C.J. 127, § 1462. The test turns on who controls the servant in the named employment."

There is no question but that the foregoing is the rule of law recognized by the Kentucky Court of Appeals, in the Gradison Construction case, as well as the following cases: Board of Common Council of Frankfort v. Hall, 227 Ky. 599, 13 S.W.2d 755; Hill v. Poindexter, 171 Ky. 847, 188 S.W. 851, L.R.A.1917B, 699; Clendenin v. Colonial Supply Company, 267 Ky. 544, 102 S.W.2d 992; Stott v. Louisville & N. R. Co., 270 Ky. 787, 110 S.W.2d 1086; Hickman v. Strunk, 303 Ky. 397, 197 S.W.2d 442.

In the case of Board of Common Council of Frankfort v. Hall, supra, the City of Frankfort had rented from Andrews Asphalt Company certain machinery and employees of that Company, who were experienced in handling and taking care of the machinery. Hall recovered a judgment against both the City and Andrews Asphalt Company and the Court of Appeals reversed the judgment against the Asphalt Paving Company and said—

"The city was in sole and exclusive charge of the work, and in like control of the men and machinery. The men were under the orders of the city, and it could begin and stop the work at will. Under such circumstances, the owner of the tools and machinery is not liable for damages arising from the acts of the city while using the appliances lent to it." [227 Ky. 599, 13 S.W.2d 756.]

In Hickman v. Strunk, supra, Hickman was the owner of a wrecker and the employer of its operator which he had furnished to Porter. The wrecker and its operator were doing work which Porter had contracted to do. The Court held that Hickman was entitled to a directed verdict because Porter had the right to control the operation of the machinery and the worker using it when the injury occurred.

The other cases relied upon by defendant's Counsel support the rule quoted by him from the Gradison case.

Plaintiffs' Counsel relies upon Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, and the Court has noticed the following cases which seem in line with the ruling of the U. S. Supreme Court in the Standard Oil case: American Telephone & Telegraph Co. v. Ohio Valley Sand Co., 131 W.Va. 736, 50 S.E.2d 884; Doty v. Lacey, 114 Cal.App.2d 73, 249 P.2d 550; Nolan v. Joplin Transfer & Storage Co., 239 Mo.App. 915, 203 S.W.2d 740; Pennsylvania Smelting & Railway Co. v. Duffin, 363 Pa. 564, 70 A.2d 270, 17 A.L.R.2d 1384; Rockwell v. Grand Trunk Western Railway Company, 253 Mich. 144, 234 N.W. 159, and Ramsey v. New York Central Railroad Company, 269 N.Y. 219, 199 N.E. 65, 102 A.L.R. 511.

In the Standard Oil case, supra, Anderson, the plaintiff, was an employee of Torrence, a stevedore, who under contract with Standard was loading the hold of a ship with oil when Anderson was injured by the negligence of a winch operator, an employee of Standard and operating a winch and drum owned by Standard, which it had furnished to Torrence for use in the loading operation. The winch operator was hired and paid by Standard and, as in the case at bar, operated the winch in accordance with signals given by an employee of the stevedore.

For the use of the winch and drum and the operator, Standard was compensated by the stevedore.

It was contended by Standard that the operator of the winch was doing the work of the stevedore under signals and direction of the stevedore and that under the "Lent Servant and Equipment Rule", the stevedore was the master and solely responsible as such for the negligence of the operator. The Supreme Court stated the rule and the method for determining the master responsible as follows, 212 U.S. at page 221, 29 S.Ct. at page 254:

"It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men became pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because,

though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."

Applying the rule to the particular facts of that case, the Court concluded that Standard was the Master and responsible for the negligence of the winchman. The Court said 212 U.S. at page 225, 29 S.Ct. at page 255:

"The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct, or any other reason. In order to relieve the defendant from the results of the legal relation of master and servant it must appear that that relation, for the time, had been suspended, and a new like relation between the winchman and the stevedore had been created. The evidence in this case does not warrant the conclusion that this changed relation had come into existence. For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum, and the winchman were its own. It did not furnish them, but furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control."

Defendant's Counsel lays great stress upon the fact that the derrick crane operator, Uebelhoer, was obeying the signals of Raymond Custer, an employee of Petroleum Piping Company, but the Court held that the giving of the signals was not the *"giving of orders but of information"*, and that obedience to the signals showed cooperation rather than subordination.

The legal effect of the contract between the foreman of Chicago Bridge and Petroleum Piping was that in consideration for like service of Petroleum Piping's crawler crane and its operating engineer in doing certain parts of Petroleum Piping's contract, Chicago Bridge would, with his derrick crane and operator, do so much of the work of Petroleum Piping's contract as required the use of the derrick crane.

The teaching of the Standard Oil case has been accepted in many jurisdictions. In the case of American Telephone & Telegraph Co. v. Ohio Valley Sand Co., 131 W.Va. 736, 50 S.E.2d 884, 885, the Telephone Company sued the Sand Company for damages sustained when a floating derrick with a boom eighty feet high, owned and operated by the Sand Company, damaged the Telephone Company's wires crossing the Kanahwa River. The derrick was being towed with the boom in practically a vertical position. A jury verdict for the Sand Company was reversed. At the time of the accident, one Harmon had made an oral lease with the Sand Company to use the derrick in Harmon's business of transporting slag on the river. The lease of the derrick between Harmon and the Sand Company provided that—

"Harmon was to receive the services of an engineer, fireman and watchman employed by the Ohio Valley Sand Company upon whose payroll they were to remain during the period of the lease to Harmon."

The Sand Company furnished fuel, lubricants and other supplies for the derrick. Harmon reported to the Sand Company when the derrick was moved from

one location to another. Harmon hired from Rake a tug to tow the derrick and a load of slag owned by Harmon up the river to the place where it was unloaded. It was on the return trip after unloading the slag that the collision occurred between the boom of the derrick and the telephone wires.

In reversing the trial Court, who had directed the verdict for the Sand Company, the Supreme Court of West Virginia said—

"It would seem plain * * * that J. W. Harmon had complete control to direct the work to be done, the slag or other material to be handled, and the time and place for the derrick and its crew to be in discharging their duties to him. To this extent he undoubtedly is to be regarded as the employer of Owen Berga, the engineer, and of the fireman and watchman of the derrick. But under the facts as shown by the proof is it necessary to conclude that he could direct and control the engineer in the operation of the engine and the location of the boom involved in that engine's operation and discharge the engineer for failure to comply with his instructions? Could he have directed Berga to increase the steam pressure and the speed of the derrick's performance? Perhaps he could have done so, but we believe that under the facts shown by the testimony in this case that is not a necessary conclusion and consequently that a jury could have found differently. This derrick was an extremely large and quite valuable machine. It is not shown that Harmon was familiar with its care and operation. Plainly the Ohio Valley Sand Company desired it to be in charge of persons upon whose competence they could rely. It can easily be inferred that they did not wish to leave the selection of the persons in charge of their unusual property to another. If that be true certainly they retained the power to discharge the engineer, the fireman or the watchman for improper conduct. The position of the boom when being moved was obviously a matter of some concern to its owner, for, while it probably is not to be classified as a dangerous instrumentality, its own safety as well as the safety of property within its reach depends largely upon its position. * * *. We are therefore of the opinion that the principle known as the 'borrowed servant' does not necessarily here apply but that whether or not the crew of the derrick in a special service became entirely or only partly Harmon's employees is a question of fact, as are most of the cases in which this doctrine is invoked."

In Doty v. Lacey, 114 Cal.App.2d 73, 249 P.2d 550, 554, the Brown Drilling Company desired its oil field equipment moved and made an oral agreement with Lacey by which the latter was to furnish trucks, crane, drivers, and crane operators to move the equipment. The day of the move, Lacey's crane broke down and he borrowed a crane from Wonderly along with its operator Winkler. Doty worked for Brown. In loading the equipment the crane was injured. Winkler asked Kennedy, Lacey's Superintendent, to have Brown's Superintendent clear Brown's men off the floor. Kennedy told Winkler to go ahead and the latter proceeded and the crane's boom broke, injuring Doty, who sued Lacey and Wonderly. The lower court directed a verdict for Wonderly on the ground that Winkler was an employee of Brown and the judgment in favor of Wonderly was reversed. The Court said—

"It may fairly be inferred that Wonderly was to do the complete job of loading the equipment onto the trucks. Operation of a crane is a distinct operation requiring the services of a crane specialist. Control of the crane and its operation was entirely in Winkler. Winkler testified he was in complete charge of the operation of the crane; the only instructions he received from

Brown were what pieces of equipment they wanted moved next, or if they disassembled a piece to tie onto it to keep it from falling to the ground; he determined where the crane was to be located for the purpose of lifting a load, whether a load was too heavy, and whether the crane was sitting properly to lift a load; anything to be done by the crane was done under his direction; that Kennedy, Lacey's superintendent, told him on which truck to place a piece of equipment. No one on behalf of Brown gave Winkler any instructions in regard to the operation of the crane, or the manner in which the work done by the crane was to be performed, or as to keeping it in working order. Even though Winkler lifted equipment onto trucks for Brown, yet in the operation of Wonderly's crane Winkler was still doing just what Wonderly employed him to do, operate the crane. *The giving of signals to Winkler was not the giving of orders, but of information; and obedience of the signals shows cooperation rather than subordination, and is not sufficient to show there has been a change of employer.*" (Emphasis added.)

Nolan v. Joplin Transfer & Storage Co., 239 Mo.App. 915, 203 S.W.2d 740, 743, involved an action filed by Nolan against the Joplin Transfer & Storage Company. Plaintiff was an employee of the Frisco Railroad. Joplin was a freight truck operator and its truck was loading boxes of cigarettes at the Railway station where Nolan was employed as a freight handler. Joplin's truck driver requested Nolan to help him load the boxes and in the course of the work Nolan was knocked down and injured by Joplin's driver. Joplin contended that Nolan was its employee and hence covered by Workmen's Compensation. This defense was disallowed and Nolan recovered a verdict. The Appellate Court affirmed the verdict and said—

"It is our conclusion that this evidence falls far short of proving that plaintiff was a borrowed servant at the time of his injury. The evidence is sufficient to show that plaintiff was not a mere volunteer or trespasser or a licensee and that he was lawfully on defendant's truck on business or for a purpose in which defendant was interested, thereby occupying the status of an invitee to whom defendant and its servants owed the duty of exercising ordinary care to avoid causing plaintiff injury while thus engaged."

In Pennsylvania Smelting & Refining Co. v. Duffin, 363 Pa. 564, 70 A.2d 270, 271, 17 A.L.R.2d 1384, the facts as stated by the Court were that the plaintiff hired from defendant a crane together with its operator for the purpose of loading a pile of lead fumes into a freight car. Defendant was a general contractor engaged in renting cranes and operators, his practice being not to rent a crane without an operator, the operators to remain on defendant's payroll just as in the case at bar.

The crane operator was attempting to load lead fumes into a gondola car. The crane struck a guy wire causing damage which was sued for in the action. The defendant contended that in the operation of the crane the operator was not its servant, but the servant of plaintiff and that therefore no cause of action existed. This contention was rejected and the Court said—

"* * * and he (owner of the crane) had the power not only in each instance to send an operator of his own choice but at any time * * * to take him off the job and substitute another,—something which, of course, plaintiff had no right to do. The possession of such power is significant in the consideration of the right of control. * * * it is inconceivable * * * that plaintiff was to direct a specialist in a field in which it would have been wholly incompetent."

A crane accident was also involved in the case of Rockwell v. Grand Trunk Western Railway Company, 253 Mich. 144, 234 N.W. 159, 160. Plaintiff, in that case, was injured when a beam being unloaded by defendant's crane, struck him. Plaintiff was in the trucking business and was engaged by a contractor, to whom the beam was consigned, to unload the beam at its freight yard. The crane was owned by defendant and its employee operated it. Defendant contended that it should not be held to answer for plaintiff's injury on the ground that, at the time of the accident, the crane operator was plaintiff's servant.

The Court said—"The plaintiff had no control over the crane or the operator except that by signals he could direct when and in what direction the beams should be hoisted. Beyond this he was not allowed to interfere with its operation."

The Court quoted with approval, the following from Johnson v. Netherlands American Steam Navigation Company, 132 N.Y. 576, 30 N.E. 505—

" 'It is quite apparent that it was the intention of the defendant to retain charge of the steam-power and winch, and operate it through its own servants and employees. And the fact that the winchman received orders from the plaintiff when to hoist and when to lower, under the circumstances of this case, does not operate to change his relations to the defendant as its servant.' "

A crane and its operator was also involved in the case of Ramsey v. New York Central Railroad Company, 269 N.Y. 219, 199 N.E. 65, 66, 102 A.L.R. 511, where the plaintiff Ramsey, an employee of Kenmore Company, which had a contract to erect a prison and had received a shipment of cell blocks at defendant's railroad yards for the unloading of which defendant furnished a crane and its operator. During the unloading Ramsey was hurt, and claimed the negligence of the operator of the crane caused his injuries. In the lower Court, a verdict was directed for defendant on the ground that the crane operator was the servant of Kenmore Company. That holding was reversed and the Court said—

"The liability of an employer for damages caused by the negligence of a servant rests upon the doctrine of respondeat superior, which makes a master liable for injuries resulting from the negligent acts of a servant done within the scope of his employment in the master's service. If, at the time of an injury, the servant negligently causing the injury, is not in the service of his employer, the principle is not applicable, and the employer is not liable, but a special master, one in whose service the servant at the time is engaged, may be liable. * * * 'He is to be deemed the master who has the supreme choice, control and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work but in all its details.' * * *

"* * * it seems clear that the crane operator at the time of the accident was the servant of the respondent and not the servant of the Kenmore Company. The direction and control remained with the respondent. It had the 'supreme choice.' The operator of the crane represented its will in the ultimate result of his work and in all of its details. The fact that the employees of the construction company helped in the work and gave directions from time to time as to details did not change the relationship and make the operator of the crane the special servant of the construction company. * * * what difference does it make whether we say it was unloading the car itself or that it loaned the crane and its operator to the construction company to do the work? In either case, it retained the absolute control of its machinery and its operator."

In the case at bar, defendant's Counsel contends that the case is controlled by Kentucky law under the Supreme Court's

decision in Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. This contention is sound. However, this Court was of opinion that the Kentucky Court of Appeals has not had for consideration a case involving equipment such as the derrick crane owned by the Chicago Bridge was. As was stated in Pennsylvania Smelting & Refining Co. v. Duffin, supra, the operator of cranes and derricks of the kind involved in this case requires technical skill on the part of the operator, and it is inconceivable that any employee of Petroleum Piping Company was authorized to or capable of directing Uebelhoer in the operation of the crane when nobody connected with Petroleum Piping is shown to have understood the operation of the crane or to have possessed the technical knowledge and skill necessary for its operation.

It is therefore the opinion of the Court that on the authority of the Standard Oil Company v. Anderson case and cases from other jurisdictions, there is a distinction on the facts between the case at bar and the cases heretofore decided by the Court of Appeals of Kentucky. It is concluded that defendant's motions for a judgment notwithstanding the verdicts of the jury, or in the alternative for a new trial, should be overruled and an order to that effect is this day being entered.